In re LAKEWOOD ENGINEERING
& MANUFACTURING CO.,
INC., Debtor.

Gregg Szilagyi, not individually but as Trustee of Lakewood Engineering & Manufacturing Co., Inc., and Sunbeam Products, Inc. d/b/a Jarden Consumer Solutions, Plaintiff,

v.

Chicago American Manufacturing, LLC, Scott Jackson and Chungkin Yee, Defendants.

Bankruptcy No. 09 B 5320.
Adversary No. 09 A 341.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Sept. 29, 2011.

Scott R. Clar, Crane Heyman Simon Welch & Clar, Chicago, IL, for Gregg E. Szilagyi.

Joseph D. Frank, Jeremy C. Kleinman, Micah R. Krohn, Frank/Gecker LLP, Chicago, IL, Michael Annis, Husch Blackwell Sanders LLP, St. Louis, MO, for Sunbeam Products, Inc. d/b/a Jarden Consumer Solutions.

Richard Hoffman, Cohen, Salk & Huvard, P.C., Northbrook, IL, Martin D. Snyder, Law Offices of Martin D. Snyder, PC, William J. Barrett, Barack Ferrazzano Kirschbaum Nagelberg, Chicago, IL, for Chicago American Manufacturing LLC.

Adam B. Goodman, Goodman Law Offices LLC, Chicago, IL, for Scott Jackson and Chungkin Yee.

## MEMORANDUM OPINION

PAMELA S. HOLLIS, Bankruptcy Judge.

On December 17, 2008, Chicago American Manufacturing, LLC ("CAM") and Lakewood Engineering & Manufacturing Co. ("Lakewood") signed a three page contract (with a one page exhibit), titled "Supply Agreement." The purpose of the Supply Agreement was to facilitate the production of certain 20 inch box fans. Lakewood had manufactured these fans for many years, but in 2008 decided to outsource their production to CAM.

Execution of the Supply Agreement, and the events that followed shortly thereafter—an involuntary bankruptcy case filing against Lakewood on February 19, 2009; rejection of the Supply Agreement; and the sale of certain of the Lakewood bankruptcy estate's assets to a third party—resulted in this litigation, filed on April 20, 2009.

A six day trial was held in September and October 2010 on Counts IV and VI–XI of the Amended Adversary Complaint (the "Complaint") filed by Gregg Szilagyi, not individually but as Trustee of Lakewood Engineering and Manufacturing Co., Inc. (the "Trustee"), and Sunbeam Products, Inc. d/b/a Jarden Consumer Products ("Jarden") (together, "Plaintiffs") against CAM. Szilagyi's original co-plaintiff was Wells Fargo Foothill, Inc. Wells Fargo sought leave to withdraw its claims, however, after Jarden purchased certain assets of the Debtor. Jarden was eventually given leave to intervene as a plaintiff. Other counts in the Complaint were dismissed earlier by stipulation, including all counts against former Defendants Scott Jackson and Chungkin Yee.

All of the counts allege that CAM acted wrongfully in its manufacture and sale of the box fans. In Counts IV and VI, the Trustee and Jarden allege that CAM infringed patents. Counts VII and VIII allege trademark infringement and unfair competition under the Lanham Act. Counts IX, X and XI also allege trademark infringement and unfair competition, but under Illinois common law, the Consumer Fraud and Deceptive Business Practices Act and the Illinois Uniform Deceptive Trade Practices Act, respectively.

The court heard eight witnesses[1], including two experts, and reviewed hundreds of pages of exhibits.

Having heard the testimony presented in court, reviewed the exhibits admitted into evidence, and analyzed the facts under the applicable law, the court finds in favor of CAM on all counts. Judgment will be entered for CAM, the remaining Defendant, on Counts IV and VI through XI.

## JURISDICTION

■ Under 28 U.S.C. § 1334(a), the district courts have exclusive jurisdiction over

---

1. References to the witnesses' testimony in this Memorandum Opinion are taken from the trial transcripts. The specific lines from the transcript are provided only when the witness is quoted.

 Gregg Szilagyi. September 15, 2010; pp. 46–131.

 Jeffrey Skinner. September 15, 2010; pp. 132–250.

 Jeffrey Martin. September 15, 2010; pp. 255–285. September 16, 2010; pp. 9–125.

 Michele Riley (expert). September 16, 2010; pp. 127–292. September 17, 2010; pp. 3–27. October 27, 2010; pp. 177–206. October 28, 2010; pp. 3–90.

 Mark Herman. September 17, 2010; pp. 29–112.

 Bernadette Barron. September 17, 2010; pp. 112–177.

 Allen Marshall. September 21, 2010; pp. 5–146.

 Mark Peterson (expert). September 21, 2010; pp. 147–254. October 27, 2010; pp. 5–175.

bankruptcy cases. The District Court for the Northern District of Illinois referred its bankruptcy cases to the bankruptcy court of this district pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a). When presiding over a referred case, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to enter orders and judgments in core proceedings within the case.

According to § 157(b)(1), core proceedings arise under Title 11, or in a case under Title 11. The resolution of this particular proceeding concerns the administration of the estate under § 157(b)(2)(A), even though the Trustee sold his claims against CAM to Jarden. This is so because if Jarden prevails, "the estate will share in the litigation proceeds, in the amount of 25% of the net monetary recoveries." Jarden Mot. for Intervention and Related Relief, ECF No. 20, p. 5 at ¶ 17. It is also a core proceeding under § 157(b)(2)(N) ("orders approving the sale of property") and (O) ("other proceedings affecting the liquidation of the assets of the estate").

The Supreme Court recently issued an opinion concerning the jurisdiction of the bankruptcy court. *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). In *Stern v. Marshall,* a creditor filed a claim and the debtor filed a counterclaim. *Id.* at 2601. The dispute before the Court centered on whether the debtor's counterclaim was a "core proceeding" under § 157(b)(2)(C), which includes "counterclaims by the estate against persons filing claims against the estate" in the non-exclusive list of core proceedings at § 157(b)(2). *Id.* at 2601–02.

The Court determined that although § 157(b)(2)(C) permitted the bankruptcy court to enter a final judgment on the debtor's counterclaim, Article III of the Constitution did not. As Justice Roberts concluded:

> Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.

*Id.* at 2620.

The instant adversary proceeding presents an entirely different procedural posture from *Stern v. Marshall.* Although CAM filed a proof of claim, the Plaintiffs' claims against CAM are not counterclaims. Indeed, in the "short and plain statement of the grounds for the court's jurisdiction" required by Fed.R.Civ.P. 8, and modified by Fed. R. Bankr.P. 7008(a) to require a statement that the proceeding is core or non-core, the Amended Complaint cites five of the 16 possible categories of core proceedings, but does not include § 157(b)(2)(C).

CAM brought a motion to withdraw the reference from this court, arguing that twelve of the 17 counts in the complaint seek relief for alleged infringement of Plaintiffs' patent and trademark rights. CAM Mot. for Withdrawal of the Reference, *Szilagyi et al. v. Chicago American Manufacturing, LLC et al.,* 09 CV 5779, ECF No. 1. Such rights do not arise under Title 11, which is federal bankruptcy law. The district court denied the motion to withdraw the reference, noting that it was possible that resolution of the issue of the effect of rejection of the Supply Agreement could "resolve, or at least simplify, some or all of the non-bankruptcy issues in

the case." Minute Order, 09 CV 5779, ECF No. 14.

That is exactly what transpired. As Plaintiffs anticipated, "the principal issues in the adversary proceeding are whether CAM has a valid license to use certain Lakewood marks and patents under Illinois law and whether any such license was terminated when the Bankruptcy Court approved the rejection of CAM's purported license under 11 U.S.C. § 365." *Id.* In the end, the district court's prediction was fulfilled; this court is ruling only on claims "derived from or dependent upon bankruptcy law," unlike the state law tort action at issue in *Stern v. Marshall. Stern,* 131 S.Ct. at 2618.

In the course of this Memorandum Opinion, this court interprets a contract under principles described in Illinois law, and then determines the effect of rejection of that contract under bankruptcy law. Rejection of a contract and the effects thereof are creations purely of bankruptcy law. This action clearly "stems from the bankruptcy itself." *Id.*

There is a discussion in this Memorandum Opinion of CAM's proof of claim, but only insofar as it relates to whether CAM elected to retain its rights under bankruptcy law; there are no counterclaims being litigated. As District Judge Dow stated in denying CAM's motion to withdraw the reference: "The issues concerning the rejection of the supply agreement and CAM's asserted license rights under that agreement are core proceedings." Minute Order, 09 CV 5779, ECF No. 14.

For all of the reasons described above, this is a core proceeding, and this court has jurisdiction to enter a final judgment on the complaint.

## FINDINGS OF FACT

The parties agreed to certain stipulated facts prior to beginning the trial. These facts are incorporated into the court's Findings of Fact where the court finds them to be relevant.

### History of CAM and Lakewood

Mark Herman and Jeffrey Skinner have been in the steel business together since Skinner joined Herman at Blackhawk Steel, a steel service center, in 1987. Skinner, p. 192. Herman and Skinner wanted to move from processing into the manufacturing business. Herman, p. 31; Skinner, p. 135. In order to make that move, Herman and Skinner created CAM in 2005. They accomplished this by purchasing the assets of a manufacturer through an assignment for the benefit of creditors. Herman, p. 31; Skinner, pp. 134–135. CAM is owned by Herman (60%), members of Herman's family (30%) and Skinner (10%). Skinner, p. 133.

Prior to 2008, Lakewood was one of the three largest manufacturers of box fans in the United States. Stipulated Facts, ¶ 1. Box fans are one of eight or nine different types of fans within the portable fan marketplace. Martin, pp. 260–261. In 2007, between 8 million and 11 million box fans were sold in the United States. Martin, p. 270.

One of the products Lakewood manufactured was a 20 inch box fan under the Lakewood brand name (the "Lakewood Box Fan"). The standard Lakewood 20 inch box fan was model number 101NS. Lakewood also made a "Rain Guard" 20 inch box fan which had modifications designed to make the fans resistant to the effects of rain. Stipulated Facts, ¶ 2.

Throughout 2008 and until the sale of its operating assets in May 2009, Lakewood owned a series of patents and trademarks relating to Lakewood 20″ 101–NS model box fans, including Patent Nos. 5,829,956 and D441,443 (collectively, the "Lakewood Patents") and Trademark Registration

Nos. 949,246 (the "Lakewood Trademark"), the validity of which CAM does not dispute. Stipulated Facts, ¶ 3.

Herman was familiar with Lakewood through Blackhawk Steel, which used to service the metal frame for Lakewood's box fans. Herman, pp. 32–33.

*Lakewood Decides to Outsource Its Box Fan Manufacturing and Chooses CAM as the New Manufacturer*

In the summer of 2008, Lakewood made the strategic decision to outsource the manufacturing of certain of its products, including the Lakewood Box Fans. Stipulated Facts, ¶ 5. At the time, Lakewood was losing half a million dollars each month from manufacturing the Lakewood Box Fans. Barron, p. 122. Lakewood had serious discussions with at least three potential manufacturers, including CAM. *Id.*

CAM reviewed Lakewood's building materials and costs, as well as the labor component of manufacturing the box fans. It observed production at Lakewood's plant. Skinner, p. 195.

Eventually, Lakewood selected CAM to manufacture 20 inch box fans at a cost to Lakewood of $7.19 per fan. Stipulated Facts, ¶ 5; Skinner, pp. 195–196. Several people were involved in determining the price such that CAM would be paid "cost plus profit margin that would still come in [low] enough to leave a profit margin for Lakewood." Barron, p. 129, lines 10–12.

In 2008, manufacturers were selling box fans to retailers in a price range between $11.90 and $12.25. Martin, p. 271. The price at which these retailers sold fans to the public was between $14.99 and $19.99, depending on the retailer. Martin, p. 275. The year 2008 "was the strongest year on record for the fan category." Martin, p. 271, lines 24–25.

Lakewood chose CAM because it had the capacity to manufacture over a million box fans in a year. Barron, pp. 122–123. Lakewood projected that CAM would manufacture approximately 1.2 million box fans during this first year. Barron, pp. 126–127.

The parties agreed that Lakewood would supply the motor and cord set at no cost to CAM, while CAM would provide all other raw materials and all of the labor. For $7.19 per fan plus the motor and cord set, Lakewood would receive "a box fan ready to ship to their customers, packaged and on the slip sheet. So it would load right into the trucks, and it would be ready to ship." Skinner, p. 196, lines 5–8.

CAM believed that this arrangement was a good business decision because while box fan production is a labor-intensive, seasonal business, it is a manufacturing business that is likely to stay within the United States and its construction is not highly sophisticated. Herman, pp. 34–36.

Each and every one of the Lakewood-branded 20″ box fans, made or sold by CAM read on, or was covered by, at least one valid claim of each of the Lakewood Patents and bore the Lakewood Trademark. Stipulated Facts, ¶ 4.

*CAM Prepares For Production and Begins Manufacturing Lakewood Box Fans*

In connection with Lakewood's decision to outsource the manufacturing of its 20 inch box fans, certain Lakewood manufacturing equipment was moved to CAM's facilities, along with the transfer of the designs, specifications, packaging designs and other information necessary for CAM to make Lakewood-branded 20 inch box fans for Lakewood. Lakewood also transferred to CAM parts and materials used in the manufacture and packaging of 20 inch box fans. Stipulated Facts, ¶ 6.

Lakewood sent "some of the line guys over there to get the equipment back up and running on their facility. The engi-

neering guys went over there, and quality control, to make sure that the product was being made to the specifications." Barron, p. 125, line 23—p. 126, line 2.

In order to accommodate the Lakewood equipment and manufacturing requirements, CAM changed the entire layout of its facility. "[W]e had to lay out new air lines, we had to lay out electrical lines. We had to . . . buy new equipment, which included molding machines, which included material-handling apparatus. We had to hire new workers. It was quite involved." Herman, p. 38, lines 4–9; Skinner, p. 197. CAM also hired new employees for the assembly line, and conducted training. Skinner, p. 198.

Box fans are a seasonal product; retailers want them in the stores in early to mid-spring. Manufacturers must ship the box fans starting in November and continue shipping through late spring. Skinner, p. 205. Retailers generally make commitments in August or September of the previous year for the box fans they intend to sell the next spring. Martin, p. 263.

Consequently, Lakewood told CAM that it should be a month ahead in all of its box fan production. With this in mind, CAM "invest[ed] in at least 60 days' inventory of all the parts that were needed. . . . [W]ith all the investment in the parts and all the infrastructure changes we had to make, I'm guessing [the total commitment was] around a million dollars, or a little over a million dollars." Herman, p. 38, lines 14–15 and 19–22. Approximately half of that cost was attributable to installing and purchasing the manufacturing equipment, while the other half was 60 days' worth of materials and product to produce box fans. Most of those materials and product were used in the production of Lakewood Box Fans, and the material-handling apparatus is still being used for the manufacture of CAM's own fan line. Herman, p. 93.

Lakewood issued a purchase order to CAM on September 4, 2008, for 20,000 box fans. DX 16. Of those fans, 10,000 were manufactured solely from materials ("the front grille, the rear grille, the blades") that Lakewood had left over from last season. Skinner, p. 203, lines 22–23. The other half of the order was manufactured according to the arrangement worked out by the parties—Lakewood supplied the motor and cord set, and CAM supplied the remaining materials and the labor. Skinner, p. 204.

In September and October, 2008, CAM manufactured an initial batch of approximately 88,520 20″ box fans. Lakewood purchased 60,760 of these fans during September and October. Stipulated Facts, ¶ 7.

On October 17, 2008, at CAM's request, Lakewood issued two purchase orders to CAM for 20″ inch box fans on the following schedule:

| | |
|---|---|
| November 2008 | 3,640 |
| December 2008 | 20,280 |
| January 2009 | 24,440 |
| February 2009 | 67,600 |
| March 2009 | 96,720 |
| April 2009 | 234,000 |

DX 17; Barron, p. 155. Skinner understood that the purchase orders "formalized" the quantities that Lakewood wanted. Skinner, p. 244, line 12.

Two separate purchase orders were issued to CAM in order to distinguish fans to be produced for Wal–Mart from those produced for every other retailer. Skinner, page 206. The purchase orders indicate that final terms are "TBD" or "to be determined." Barron explained that TBD is on the purchase orders because "this happens to be a canned form that comes out of QuickBooks, and, therefore, there is a box that says, final terms to be determined." Barron, p. 156, lines 23–25.

In November, 2008, CAM manufactured 47,920 additional 20″ box fans. Lakewood did not purchase any fans from CAM during the month of November, 2008. Stipulated Facts, ¶ 8.

*CAM and Lakewood Negotiate the Supply Agreement*

CAM was concerned about the state of Lakewood's finances. CAM insured all of its receivables, but eventually, its insurance carrier notified CAM that the carrier would not insure Lakewood's receivables.

> And at that point, we had to have some of our instrument [sic] to protect ourselves. I was not going to make that kind of investment in this product without having some sort of protection.

> Q: *From your perspective, what was the primary purpose of the Supply Agreement?*

> A: Well, the primary purpose was to protect—we're getting involved in this huge operation that's going to require us to fulfill all these—this level of production for these box fans, and I wanted to make sure that I wasn't going to be left holding the bag at the end of it. I wanted to make sure that I was going to get paid for these fans.

Herman, p. 40, lines 8–20. *See* Skinner, pp. 212–213. CAM considered taking a security interest, but determined that negotiating a supply agreement with Lakewood would be the "best option." Herman, p. 89.

Skinner at CAM and Bernadette Barron, who was the CFO at Lakewood, worked together to develop the agreement. Skinner, p. 138 and pp. 211–212. Barron is a turnaround professional who was employed at Morris Anderson. Lakewood retained Morris Anderson, and Barron joined Lakewood as its chief financial officer in late December 2007. Barron, p. 115. Barron wrote the first draft of the Supply Agreement, and negotiated with Herman, Skinner and CAM's attorney, Bruce Waldman. Barron, pp. 130–131.

Barron agreed that it was reasonable to have such an agreement in place to protect CAM, because CAM was making product for a financially troubled company. "[I]f Lakewood was not able to buy that product, [CAM] needed some assurance that they were not that money out of pocket." Barron, p. 136, lines 7–10; DX 3. She talked about this issue with various individuals at Lakewood, including Ken Yee (head of engineering), Scott Jackson (head of sales), John Hitchcock (controller) and Chris Kraus (partial owner). All agreed that CAM should be given the protection it was requesting—the ability to sell box fans produced *for* Lakewood but which Lakewood did not purchase. Barron, pp. 137–138; DX 4.

Barron emailed CEO Ross for his opinion, and he agreed with the consensus reached by the other Lakewood employees and owner. Barron, p. 139. To avoid leaving CAM with a huge inventory of fans that it could not sell because of the Lakewood trademark, "it was agreed that they could, therefore, turn around and sell the product that they had on hand to either our [Lakewood's] customers or to any other source so that they could get their money back." Barron, p. 149, lines 15–18; DX 3 ("[CAM] wants an agreement they can liquidate their Lakewood inventory in the event there is left over inventory at the end of the season (or when we crash)".).

Exhibit A to the Supply Agreement is a month by month forecast of the 20″ box fans that Lakewood wanted CAM to manufacture. This forecast required CAM to manufacture hundreds of thousands more Lakewood Box Fans, over a longer period of time, than specified in the October 17 purchase order:

| December 2008 | 20,280 20″ Box Fans |
| January 2009 | 24,440 20″ Box Fans |
| February 2009 | 119,600 20″ Box Fans |
| March 2009 | 100,360 20″ Box Fans |
| April 2009 | 230,880 20″ Box Fans |
| May 2009 | 372,320 20″ Box Fans |
| June 2009 | 239,800 20″ Box Fans |
| July 2009 | 74,880 20″ Box Fans |
| August 2009 | 42,640 20″ Box Fans |

PX 1 and DX 1.

In the event Lakewood could not purchase the already-manufactured Lakewood Box Fans, or left CAM holding raw materials, CAM wanted to "be able to produce the fans from the raw material that [it] had, and then be able to sell the fans with a license, with a broad license." Skinner, p. 215, lines 15–18.

Herman intended to protect CAM with an agreement that "allow[ed] us to produce fans for the forecast. In the event that Lakewood would not be able to pay for those fans, that we would be able to take those fans out to the market and sell them to third parties ... [I]f, in fact, Lakewood did not purchase the fans within 30 days of [the end of the forecasted month], then we were allowed to sell that portion of the forecasted amount to third parties." Herman, p. 42, lines 6–10 and 14–17.

Barron's understanding of CAM's intent in putting this agreement in place was the same. "The agreement does not say that, but, yes. At the time, I would have thought that [CAM] could complete what they had in hand, because the purpose was that they would not be out of cash as a result of making the fans for us." Barron, p. 151, lines 8–12. *See* Barron, p. 153, lines 2–5 ("[T]o the extent that they had motors on site, even though they continued to belong to Lakewood, my assumption would be that I was granting them the right to finish making out that line."); and p. 160, lines 11–14 ("[I]t is foreseeable that [CAM] might have had a couple of hundred thousand on hand if they had had

enough time to build up to what we wanted in April and May.").

Skinner worked across the table from Barron in drafting the Supply Agreement, and his reading of the Supply Agreement is the same as Herman's and Barron's. "The most important part of this particular [provision] was to give us a license. Since we were producing a Lakewood product, it was critical for us to have a broad license to be able to take the raw materials that we had invested in to make a fan, and then be able to sell that fan." Skinner, page 222, lines 10–15.

Barron did not expect CAM to terminate the Supply Agreement and begin selling to third parties if Lakewood did not purchase a certain month's forecast just one time:

[L]et's just say in December, we [Lakewood] were supposed to buy 20,-280, and we did not buy that in December, we did not make up the quantity in January, okay, then, yes, they [CAM] would have had the right to terminate the agreement.

But if Lakewood was still in business, they would never have done that, because had they terminated the agreement, they would not be able to make the fans going forward that Lakewood would need.

And so, therefore, from a practical standpoint, even if we had not bought that specific amount, they would not have terminated the agreement. But, technically, yes, they could have.

Barron, p. 166, line 17—p. 167, line 5.

The term of the Supply Agreement was for only one year, but the parties had "a lot of discussions about having a longer-term agreement. And we [at CAM] were led to believe by the people at Lakewood that there would be no reason not to continue it, as long as we met our obligations, but they did not want to put it in this

agreement." Herman, p. 48, lines 8–13. CAM hoped that this arrangement would last more than one year, "because we were making a lot of investment to set this up. There was a lot of—the installation of equipment, electrical parts, all entailed to get up and running. There was a lot of one-time costs to get started that we were hoping as time went on we wouldn't have those costs." Skinner, p. 199, lines 14–20. Lakewood also "intended it to be a longer-term relationship." Barron, p. 141, lines 10–11.

Barron agreed that the intent of the Supply Agreement was, in part, to allow CAM to recoup its startup costs if Lakewood failed to buy the forecasted fans and if CAM had product on hand to sell:

> The intent was that CAM should not have been out of pocket because they agreed to supply a financially cash-strapped company.
>
> So to the extent that they had paid money out to get their facility up and running, and they had not made that money back through the profits of the product that they had sold to Lakewood, then, yes. I would have said that that was part of the cash that the intent was for them to recoup.

Barron, p. 174, line 19—p. 175, line 2.

Despite the existence of the Supply Agreement, the partnership with Lakewood was not a profitable venture for CAM. Herman, p. 70.

*Fans That Were Already in Inventory When the Agreement was Signed*

At the time CAM entered into the Supply Agreement, it had 70,637 completed 20″ box fans (the "2008 Fans") already in inventory. Lakewood and CAM intended for the 2008 Fans to be covered by the Supply Agreement. Herman, p. 44, lines 16–19; *see* Barron, pp. 145, line 22—p. 146, line 2 ("yes, it would be covered under this,

but it wasn't something that would have been separately discussed") and p. 159, line 22—p. 160, line 1 ("[C]learly, they had some on hand that would be included in these sales, especially since this wasn't even signed until December 17th, and they had already made deliveries to Lakewood for December.").

Although the Supply Agreement was signed in mid-December 2008, the forecast contained fan requirements for December 2008 and January 2009. CAM needed to manufacture fans well before the month in which their need was forecast "in order to make sure [CAM] had enough finished goods to hit the peak season." Skinner, p. 221, lines 7–8. Section B(3) of the Supply Agreement gave CAM the right to manufacture product in advance so that CAM could build up its inventory levels to meet the forecast. Skinner, p. 220; Barron, p. 147.

Lakewood recognized that "CAM's facility was not large enough to make the high-quantity months, for instance, in the month before, and so for—therefore, they determined their own schedule for when they were going to make the product so that it would be available when we needed it to sell." Barron, p. 127, lines 13–18. It was important to produce the fans well in advance of the forecast, "[s]o in case customers took fans ahead of schedule, or in case their volume increased, that [Lakewood] would be able to react." Skinner, p. 202, lines 7–9.

*Obligations Under the Supply Agreement*

The Supply Agreement provided that if:

> [CAM] is not in default hereunder, Lakewood agrees to order all of its actual requirements for the Product, up to the amounts set forth in the forecast,

from [CAM] and not from any other supplier or source.

PX 1 and DX 1, Paragraph A(1).

CAM "wanted to make sure that ... [Lakewood] all of a sudden mid-season didn't purchase from someone else, or have some reason not to buy from us. We wanted to make sure all of their actual requirements were purchased from us since we were producing to their forecast." Skinner, p. 217, lines 15 and 17–21; Barron, p. 142.

CAM is obligated, however, to manufacture according to the forecast in Exhibit A:

> Supplier shall manufacture, sell and ship product to Lakewood or Lakewood's customer in accordance with this Agreement and Lakewood's future Purchase Orders consistent with this Agreement. Lakewood's forecast of its requirements for the Product ("Forecasted Products") is attached hereto as *Exhibit A.*

PX 1 and DX 1, Paragraph A(1).

Barron explained why CAM was under this obligation:

> Wal–Mart, who was our largest customer, did not do purchase orders. They would merely give you an indication of what they thought they might buy, and other customers did the same. And even those customers that would give us a purchase order could obviously change the purchase order as they got through the season.
>
> So there was no way that we would know ahead of time actual need until it had actually transpired.

Barron, p. 143, lines 18–25—p. 144, lines 1–2.

Herman agreed that this particular product could not be manufactured to an "actual requirements" standard:

> [A]s a manufacturer, you need to gain some efficiencies, and the only way we could do it is to run it the way we have it

laid out.... To put that kind of investment into doing actual, where one month it's this, it's that, you cannot—you can't create an efficient flow of product and still expect to be able to hit the stores with the amount that they are required to.

Herman, p. 45, lines 19–21; p. 46, lines 1–5.

CAM was "told to focus strictly on this forecast, and it was our responsibility to make sure that we produced ahead of the forecast. So whatever the sales were on their end, we were told strictly focus on the forecast, make to the forecast." Skinner, p. 201, lines 19–24. CAM could not unilaterally decide that Lakewood did not need more fans "and, therefore, stop making them.... They had to make what we requested." Barron, p. 144, lines 22–24.

*Rain Guard Fans*

The forecast is not separated into 101NS fans and Rain Guard fans, but requires only the manufacture of 20″ box fans. "There were two styles of 20–inch box fans ... [CAM] made both of them at one point or another.... There is a 101 NS, which is a 20–inch box fan, and there's an R225, which is a premium style 20–inch box fan." Skinner, p. 136, lines 20–21 and lines 24–25; p. 137, lines 2–4. Both the 101NS and the Rain Guard are 20″ box fans. *See* Stipulated Facts ¶ 2.

The parties' understanding was that Lakewood wanted CAM to manufacture Rain Guard fans. Barron, p. 125. At the time the agreement was signed, however, Lakewood didn't know how many or when they would be needed. The number of fans in the forecast that would need to be Rain Guard fans would be communicated at a later date. Skinner, p. 175; pp. 200–201; p. 219; and p. 242; Barron, p. 147, lines 2–3 ("the Rain Guard would have been covered under this agreement"); and

pp. 158–159. CAM understood that Rain Guard fans would be a very small portion of Lakewood's purchases. Herman, pp. 86–87.

As early as November 6, 2008 and as late as February 11, 2009, Lakewood requested that CAM manufacture Rain Guard fans for at least one Lakewood customer, and Lakewood provided CAM with materials, specifications and information necessary for CAM to manufacture these Rain Guard fans. Stipulated Facts, ¶ 12. On February 3, 2009, Lakewood provided CAM with a revised forecast that separated out the number of Rain Guard fans. DX 21; Skinner, pp. 239–240.

CAM did not manufacture any Rain Guard fans until June 2009. Skinner, p. 246.

### Supplying the Raw Materials

The Supply Agreement also memorialized in writing the agreement that Lakewood was to supply the motors and the cord sets, and that CAM would provide all the other raw materials. PX 1 and DX 1, Paragraph A(2) ("Lakewood shall supply all motors and cord sets needed for the Product at no cost to [CAM]. [CAM] shall secure and provide all other needed materials and labor."). *See* Barron, p. 152, lines 17–20 ("[A]t the time this agreement was written, it was assumed that we [Lakewood] were supplying the motors and cord sets, which is the expensive parts."). *See* Barron, p. 171, line 25—p. 172, line 4 ("So to the extent that they had bought motors and cord sets from us because we [Lakewood] were cash poor, it would have been my intent that they could have taken those motors and cord sets and finished out that particular run."). *See* Skinner, p. 233, lines 13–16 ("[A]ny and all would be including raw materials and the finished goods. So raw materials to produce a fan, plus all the finished-good fans that will be on the floor."). The Supply Agreement also included "any parts that were used to execute this ultimate forecast." Herman, p. 44, lines 24–25.

### CAM Begins Manufacturing Under the Supply Agreement

CAM and Lakewood entered into the Supply Agreement on December 17, 2008. CAM did not manufacture any additional 20″ box fans in December 2008, although Lakewood purchased 4,960 20″ box fans from CAM on December 16, 2008. Stipulated Facts, ¶ ¶ 9–11; DX 18. These fans were stored in space CAM rented from Lakewood at Lakewood's facility. Skinner, p. 208; *see* Barron, p. 128.

During January 2009, CAM produced 55,040 20″ box fans. At the end of January 2009, CAM held at least 125,677 20″ box fans in inventory. Stipulated Facts, ¶ 19.

During February 2009, CAM produced an additional 96,220 20″ box fans. At the end of February 2009, CAM held at least 207,457 20″ box fans in inventory. Stipulated Facts, ¶ 20.

On February 3, 2009, the purchasing manager for Lakewood sent an email to Skinner, revising the forecast originally attached to the Supply Agreement. DX 21; Skinner, p. 228. This revised forecast separated out fans to be produced for Wal–Mart from fans to be produced for all other retailers. It also described, for the first time, the forecasted amounts of Rain Guard fans. Skinner, p. 239. In response to this revised forecast, CAM made changes to its internal production plan. Skinner, pp. 229–231; DX 22.

On or about February 19, 2009, CAM and Lakewood entered into a barter transaction pursuant to which Lakewood gave CAM 45,360 motors in exchange for 14,469

20″ box fans. Stipulated Facts, ¶ 23.[2] The bill of sale for that transaction provides:

Lakewood agrees that CAM shall be fully authorized to use and/or sell any and all of said Motors at any time hereafter, and as to any of the Motors containing Lakewood's name or mark thereon, Lakewood hereby grants an unconditional irrevocable license to CAM to sell said Motors separately and not as part of fans, to any customer whatsoever, or to use said Motors by incorporating them into fans.

DX 6. *See* Barron, pp. 175–177; Marshall, pp. 8–9.

Other than this transaction, Lakewood acquired no 20″ box fans from CAM after December 17, 2008. Stipulated Facts, ¶ 24.

On February 19, 2009, an involuntary bankruptcy petition was filed against Lakewood. CAM was aware of this petition within days of its filing. Stipulated Facts, ¶ 22. Once CAM knew that Lakewood was insolvent, it no longer expected Lakewood to purchase box fans, "[u]nless they got some infusion of capital." Herman, p. 102, lines 14.

*CAM Attempts to Acquire Lakewood, and at the Same Time Begins Setting Up Its Own Box Fan Company*

In late December 2008, a meeting took place among Herman, Skinner and Lakewood's CEO, James Ross. Ross came to CAM's manufacturing facility, told Herman and Skinner that Lakewood was having trouble paying for the motors it had ordered, and asked if CAM would be interested in investing in Lakewood. CAM was interested. Herman, pp. 48–49.

For the same reasons that he wanted to manufacture fans, Herman believed that [a]ctually owning the product was very intriguing, and so we pursued that vigorously. We met with them at their facility. We did our due diligence to—we looked at the balance sheet; we looked at their liabilities; we looked at not only their trade liabilities, but their insurance liabilities; we looked at their sales. And we ultimately made an offer.

Herman, p. 49, lines 8–15.

This process, resulting in an offer to purchase stock, took about six weeks. Lakewood's board of directors turned down the offer. Barron, p. 173.

After the bankruptcy filing, CAM followed two parallel paths. On the one hand, it pursued the possibility of purchasing Lakewood. CAM "approached the trustee to try to buy the assets of Lakewood to ultimately secure that and potentially become Lakewood." Herman, p. 55, lines 4–6. Eventually CAM was the stalking horse bidder at the bankruptcy auction for Lakewood's assets, extending a bid in the amount of $1,791,175.50 to purchase Lakewood's operating assets. *See* Stipulated Facts, ¶ 32.

CAM's other path was setting itself up as a fan company, without purchasing the Lakewood name and materials. "We were confident that we were proficient at producing these box fans now. We had the knowledge and the skill set, and we were going to take a new path." Herman, p. 52, lines 6–9.

As early as February 26, 2009, CAM began exploring opportunities to sell 20″ box fans to individuals and entities other than Lakewood. Stipulated Facts, ¶ 25; Herman, pp. 53–54; Skinner, p. 159. Although it initially sold box fans under the Lakewood brand, CAM's "belief was that

---

**2.** Stipulated Fact ¶ 23 states that the number of fans in the barter transaction was 14,440. The bill of sale at DX 6 indicates that the number was 14,469. The difference is immaterial, but noted here for completion and accuracy.

at a certain price level, people don't care what brand is on there, whether it says Lakewood or whether it says anything else." Herman, p. 104, lines 12–15. This is not a universal belief. "Brand is important to how anything sells," including box fans. Martin, p. 268, lines 11–12. "If two products are on the shelf with the exact same price, the brand the consumer recognizes or trusts will win that purchase." Martin, p. 268, lines 21–24.

Almost immediately after the involuntary petition was filed, the manufacturers' representatives who had been dealing with Lakewood approached CAM about selling fans to their customer base. Herman, p. 54. CAM did not share this information with Chapter 7 Trustee Szilagyi or with Wells Fargo Bank, Lakewood's largest creditor. Herman, p. 85.

Martin explained the crucial role of a manufacturer's representative in the relationship between a manufacturer and a retailer:

A manufacturer's representative is a representative, a person, a salesperson that either has sought us out or we have sought out because of their relationship with a key account, whether it be a Lowe's, or a Home Depot, or Menard's, for instance. That person will have a relationship with them, and then come and broker, if you will, or sell our products for us. . . . Having a manufacturer's rep is critical for the cost equation, obviously, because you can't—we can't, as an organization, you know, want to afford to carry that many 40 plus salespeople that are on the streets. So we hire rep groups to go out and solicit this business, and we pay them a percent of what they sell. That way we're not carrying the overheads of salaries. . . . [T]hey provide relationships. Relationships are critical in any selling process. . . . Manufacturer representatives will normally sell many different product lines. So, for instance, if they're selling to Lowe's, this particular manufacturer's rep may carry fans from JCS, and toothbrushes from another manufacturer, and Solo cups from Solo. So because they're a stop shop or a—not a one stop, but they carry a broad array of products, they're important to that retailer. And so it gives them that single line of communication. And, obviously, over the years, they form that trust with that representative.

Martin, p. 264, lines 15–22; p. 265, lines 1–8, 11–12 and 20–25; p. 266, lines 1–5 (questions omitted).

Jeff Warner was the manufacturer's representative for Sears/Kmart. A week after the involuntary filing, he sent a document to Skinner so that they could explore what might be done to protect Sears/Kmart, to explore CAM's options, and to deal with open items going forward. Skinner, pp. 162–165; PX 48. Warner indicated that Sears wanted to buy 50,000 Rain Guard fans. CAM did not share this document with the Trustee, who would not be appointed until approximately two weeks later. Skinner, pp. 166–167; PX 48. This was "a very fluid situation. It was a situation that we had not encountered before. We were exploring our options." Skinner, p. 168, line 25—p. 169, line 2.

On March 10, 2009, CAM issued Purchase Order 14591 in which it ordered 90,720 box fan motors bearing the Lakewood Trademark from Supreme Industrial Motor, Ltd. (the "SIM Motors"). DX 25. CAM received the SIM Motors after the Supply Agreement was rejected. Stipulated Facts, ¶ 27. It used these motors in its box fan production and sold those box fans to third parties. Marshall, pp. 9–11. CAM paid half of the balance due on March 11, 2009, and the other half on June 4, 2009. Marshall, pp. 24–25.

CAM purchased 107,520 additional cord sets for use in 20″ box fans by purchase orders issued on March 25, 2009 (35,000 cord sets) and April 27, 2009 (72,520 cord sets). DX 26 and 27. Payment for these cord sets was made in full in the amount of $60,000 on March 25, 2009. Stipulated Facts, ¶ 28; Marshall, pp. 13–15. Even though CAM paid for the entire order on March 25, a purchase order was issued that day for only 35,000 cord sets because that "was all that was available at the time." Marshall, p. 16, lines 3–4.

By mid-March, CAM had hired a former Lakewood employee to help liquidate and sell both the box fans that it had in inventory and those box fans that it was producing from the raw materials on hand. Herman, p. 54; p. 61.

Before the end of March 2009, CAM sold 1,260 box fans to Albertson's. Herman, p. 57.

*Szilagyi Briefly Operates Lakewood*

An order for relief was entered in the Lakewood bankruptcy case on March 10, 2009, and Gregg Szilagyi was appointed as the Chapter 7 Trustee for Lakewood immediately afterward. Szilagyi, p. 47; *In re Lakewood Eng'g. & Mfg. Co., Inc.*, 09 B 5320, Order for Relief, ECF No. 27 and Letter of Appointment, ECF No. 28.

In the middle of March, Szilagyi "sought court approval to operate the estate on a limited basis to sell off the finished goods inventory, the heater and fan inventory, and to collect accounts receivable and to continue to maintain the facilities of the company on an ongoing basis." Szilagyi, p. 50, lines 2–7; Emergency Motion of Trustee For Authority to Operate Business on a Limited Basis, Compromise Debtor's Accounts Receivable, and Sell Inventory Subject to Security Interest of Wells Fargo Foothill, Inc., 09 B 5320, ECF No. 34. His motion to do so was granted.

Szilagyi learned during his first week as trustee that Lakewood had a relationship with CAM, and that the Supply Agreement existed. Attorney Janice Alwin called him, indicated that she was representing CAM and advised Szilagyi that CAM had done some contract manufacturing. Alwin told Szilagyi "that there had been discussions with Lakewood about acquiring Lakewood's assets or purchasing the company prior to the involuntary petition, and that [CAM] may have an interest in purchasing assets from the estate." Szilagyi, p. 52, lines 8–13. Alwin did not inform Szilagyi that CAM was currently manufacturing for Lakewood, and they did not discuss any fans that CAM had in inventory with the Lakewood brand. Szilagyi, p. 52.

Szilagyi eventually learned that CAM was still manufacturing Lakewood-branded box fans. He called Alwin to confirm this information, but she did not respond. Szilagyi, pp. 54–55. During the month of March, he had no conversations with CAM or Alwin about whether CAM would continue to manufacture fans for the Lakewood estate, whether Szilagyi would purchase fans from CAM, or any other discussions regarding a continued relationship between the parties. Szilagyi, pp. 55–56.

During March 2009, CAM manufactured an additional 109,300 20″ box fans. Stipulated Facts, ¶ 26. CAM manufactured these additional box fans because it believed the Supply Agreement allowed it to continue to produce fans in order to help recoup its investment. Szilagyi knew that this was CAM's position. Szilagyi, p. 101. Also in March 2009, CAM sold Lakewood-branded box fans to Sears at a net invoice price of $12.29 per fan. Skinner, pp. 160–162; PX 51.

At the end of March 2009, CAM had approximately 315,477 Lakewood-branded

box fans in inventory. DX 7; Marshall, p. 28.

*Szilagyi Rejects the Supply Agreement*

Szilagyi filed a motion to reject the Supply Agreement on March 27, 2009 (the "Rejection Date"). Motion to Reject Executory Contract, 09 B 5320, ECF No. 63. He had determined that the Supply Agreement was unnecessary "because we would have no further need for CAM to continue to manufacture fans." Szilagyi, p. 61, lines 8–9. Additionally, he had little information about what CAM was doing, so he "thought the prudent thing to do would be to reject the agreement," especially since the Supply Agreement might impact negatively on his prospects for selling Lakewood's operating assets. Szilagyi, p. 61, lines 15–16; p. 64.

Szilagyi was concerned:

that CAM was continuing to manufacture fans to put out into the marketplace, that I didn't have any control over that process, and wasn't quite sure what was going to happen with those fans or the brand.... I understood at that point that the Lakewood name and its intellectual property were assets of the estate, and I was concerned that, you know, any activities beyond what had been proscribed [sic] by the supply agreement might hurt the brand, might confuse the marketplace about who was manufacturing the fans, who was allowed to sell them, and what the implications of that might be.

Szilagyi, p. 61, line 23—p. 62, line 3 and p. 62, lines 5–12.

CAM did not file a written objection to the motion to reject, and Szilagyi had no conversations with CAM or its counsel prior to the hearing to discuss the motion. Szilagyi, p. 60. One of CAM's attorneys, William Barrett, appeared at the hearing to ask for clarification regarding the effect of the rejection. *Id.*

*Szilagyi Begins Selling Box Fans*

Starting at the end of March 2009, Szilagyi began selling Lakewood's inventory. He had a 27 page inventory of Lakewood's assets and he hired certain former Lakewood employees to assist in the sale of these products to both existing customers as well as any interested parties. PX 72; Szilagyi, p. 72. The orders that were open at the time of the bankruptcy filing never materialized, because "the customers who had placed orders had looked elsewhere or had specifically indicated to us that they were not interested in completing those sales." Szilagyi, p. 78, lines 21–24.

Szilagyi gave the sales staff a floor price, and he "was aware of all of the sales as they were happening, and the various communications that were taking place with customers who were understandably nervous about dealing with a company that was no longer in business." Szilagyi, p. 72, lines 23—p. 73, line 3. For the box fans, the floor price was 80% of cost. Szilagyi, p. 73. All of the box fan sales were above the floor price. Szilagyi, p. 117; *see* PX 38.

Szilagyi suspected that CAM was selling box fans at the same time, and he felt that his sales efforts were being hampered by the "information out in the marketplace about what we were doing and not doing and what our competitors were doing." Szilagyi, p. 75 and p. 79, lines 12–14.

Szilagyi learned from several different appraisers during the first week of April 2009 that CAM was still manufacturing Lakewood-branded box fans. Szilagyi, pp. 64–66. He called Alwin to find out what was going on, and when there was no satisfactory response, Szilagyi sent a cease-and-desist letter. Szilagyi, p. 66; PX 47.

*Commencement of This Litigation*

The parties began discussions about CAM purchasing Lakewood's assets. Szilagyi, p. 82. Meanwhile, Szilagyi and Wells Fargo filed this adversary proceeding, seeking a temporary restraining order against CAM. Szilagyi, pp. 84–85; PX 92. The court denied the request for a TRO. Order (I) Denying Trustee's Emergency Motion for Temporary Restraining Order; (II) Granting Preliminary Injunction Hearing and Setting Related Discovery Schedule, 09 A 341, ECF No. 8. A hearing was set on Plaintiffs' request for a preliminary injunction, and discovery commenced. *Id.*

CAM eventually filed a motion to withdraw the reference, and moved to stay this litigation while the motion to withdraw the reference was being decided. Motion of CAM LLC to Stay Proceedings Pending Determination of Motion for Withdrawal of the Reference, 09 A 341, ECF No. 65. This court entered an order on September 24, 2009, staying the litigation, although not discovery, and prohibiting CAM from manufacturing or selling any Lakewood-branded box fans. CAM was authorized to complete delivery of any fans that it had already manufactured and sold. Order Granting in Part the Motion of CAM LLC to Stay Proceedings Pending Determination of Motion for Withdrawal of the Reference, 09 A 341, ECF No. 79.

*Szilagyi Sells Lakewood's Operating Assets at Auction*

Szilagyi eventually determined that the best course of action was to sell Lakewood's operating assets through an auction process. CAM was the stalking horse bidder, a useful device in bankruptcy auctions because "it, essentially, makes a market for the assets. It draws in other potential bidders, and it sets a floor for the price." Szilagyi, p. 121, lines 15–17. Szilagyi and his attorneys had discussions with CAM about putting together the stalking horse bid. Szilagyi, pp. 121–122.

Three parties participated in the auction: CAM, Lasko and Jarden Consumer Solutions. The assets for sale included the portion of Lakewood's fan-making equipment that was located at CAM's manufacturing facility. Szilagyi, pp. 95–96. When Szilagyi and potential bidders toured CAM's facility to see the equipment, boxes were stacked in such a manner that that they could not see beyond the Lakewood fan production line. Szilagyi, pp. 92–93 and 118.

Jarden decided to participate in the auction because Lakewood offered several positive attributes—brand awareness, channel differentiation, a good assortment of fans and U.S. manufacturing. Martin, pp. 9–10. Lakewood had more fan SKUs, or "store keeping units," at desirable retailers than Jarden did. Martin, p. 57. It was Jarden's intention, regardless of whether it acquired Lakewood, to expand its capacity in 2011 from 2 million to 4 million box fans. Martin, p. 53.

Although initially Jarden believed Lakewood's heater category would complement Jarden's, in the end it "turned into a fan acquisition, more so than a heater acquisition." Martin, p. 26, lines 5–6. "It really became about the fan business and what it could do for [Jarden's] fan category." Martin, p. 15, lines 6–8.

The internal Jarden team valued the approximately 350,000 fans that CAM had already manufactured at $3.5 million. Martin, p. 14. Jarden also assumed an 8% controllable operating margin, which would result in a $2.8 million profit on box fans. Martin, pp. 21–22. Jarden valued Lakewood's assets—equipment, molds, dies, IP, relationships—between $8 million and $12 million, although it gave no value to Lakewood's trademarks because they "couldn't derive a tangible number fast enough for

presentation to senior management." DX 41 at p. 9; Martin, p. 30, lines 14–16.

Of that $8 to $12 million figure, the 24 patents and patent applications comprising IP were valued at $500,000 by Jarden's VP of finance, Scott Yales. DX 41 at p. 9; Martin, p. 67 and p. 104 (characterizing Yales' valuation of IP as a guess). When Jarden analyzes companies outside of bankruptcy to determine whether there is potential for an acquisition, the analysis generally takes four to six months. The analysis for the Lakewood acquisition was prepared in about four weeks. Martin, pp. 109–110.

Jarden entered the winning bid for Lakewood's assets at the auction. Szilagyi, p. 89. It now sells fans under several different names: Lakewood, Patton, Holmes, Bionaire, Borg and Sunbeam. Martin, p. 270. Jarden did not hire any of Lakewood's former sales personnel. Martin, p. 82. Jarden left Lakewood's existing manufacturing at both Schiffmayer and Plaspros, but not at CAM. Martin, p. 112.

Szilagyi told Jarden prior to the auction that CAM was manufacturing and selling box fans, and that CAM took the position that the rejection of the Supply Agreement did not invalidate its license to do so. Szilagyi, pp. 101–102.[3] Jarden also knew this proceeding was pending, Martin, p. 37, and that CAM had hired a former Lakewood VP of sales and marketing, Martin, p. 62 and DX 41 at p. 13. But CAM's activities with respect to the Lakewood fans didn't affect Jarden's decision to bid; to Jarden, this was just finished goods inventory awaiting the results of the auction. Martin, p. 41.

Indeed, the Asset Purchase Agreement signed on June 8, 2009, by Szilagyi as chapter 7 trustee and by Jarden, contains a paragraph titled "CAM Provision."

> Pursuant to the Court's order approving CAM's Emergency Motion Regarding Terms of Sale to Jarden entered on June 4, 2009, and to eliminate any conflict, as to CAM's rights only, between the terms of the Bankruptcy Court's Approval Order (Order Approving Sale of Property of the Estate entered on May 29, 2009) [Docket No. 132] and this Agreement, the sale of all of the Debtor's estate's right, title and interest in and to the Acquired Assets is subject to the rights to manufacture and sell, if any, previously granted to CAM pursuant to that certain Supply Agreement dated December 17, 2008 by and between CAM and Lakewood, which Supply Agreement was rejected by the Seller pursuant to the order entered by this Court on April 3, 2009, the extent, validity and continued existence of which rights, if any, shall be determined as part of the Adversary Proceeding against CAM, assigned Adv. Pro. No. 09–00321 [sic].

PX 67.

### Jarden's Post–Auction Actions

Jarden decided to wait until fall 2011 (for retail sale in spring 2012) to bring Lakewood box fans back to the market. Martin, pp. 43–44. Among other reasons, its engineering team had indicated that there were technical hurdles to Jarden's ability to build Lakewood box fans, and

---

**3.** Martin testified that Jarden believed CAM had been told to stop manufacturing, and that Jarden had no knowledge that CAM was selling Lakewood Box Fans. Martin, p. 41. However, Martin also testified that his job with respect to the Lakewood acquisition was only "to pull together the market assessments, to see what the potential business opportunity was for JCS [Jarden] within—for the acquisition of Lakewood." Martin, p. 11, lines 3–6. He was only one of a team of Jarden employees who put together the presentation made to Jarden management (which was admitted into evidence as DX 41). Martin, pp. 11–12.

recommended negotiating with CAM to produce box fans in the short run. DX 41 at p. 12. Jarden is also "waiting for the current Lakewood-branded fans in the marketplace to get out of the market-place." Martin, p. 74, lines 1–3. There could be concerns about the degradation of the Lakewood brand if the box fans manufactured by CAM are faulty, Martin, p. 106, although no evidence was presented that Jarden had done any analysis to determine whether CAM's actions impacted the Lakewood brand. Martin, p. 122.

Jarden currently is selling its Holmes box fan, and is using the Lakewood patent on the ring blade in that fan. Martin, p. 44 and p. 106. As of September 2010, Jarden had not yet manufactured a Lakewood-branded box fan. Martin, p. 73. Jarden could put a Lakewood nameplate on the Holmes box fan that is currently manufactured at a Jarden plant in Waynesboro, Mississippi within about six weeks. Martin, p. 108 and p. 114. The excess capacity at the Waynesboro plant is between 400,000 and 600,000 units within the selling season, and "upwards of a million" for the year. Martin, pp. 124 and 125, line 5.

*CAM After Rejection*

On and after April 1, 2009, CAM manufactured 108,984 20″ box fans. Stipulated Facts, ¶ 37. Of that amount, 6,880 20″ box fans were manufactured after CAM learned that it was not the winning bidder for Lakewood's assets. Stipulated Facts, ¶ 39. All of these fans were sold to third parties, and not to Lakewood. Skinner, p. 171.

CAM calculated that it lost $272,102 on its sales of Lakewood-branded box fans to third parties. PX 14; Skinner, p. 185.

Of the nearly two dozen third parties who purchased Lakewood box fans from CAM, only Sears had previously been a CAM customer. As of the date of the trial, at least eight of those companies are now purchasing CAM Air box fans: Ace Hardware, Sears, Rural King, SuperValu, Albertsons, Fred Meyer, Rocket Imports and Schnucks. Skinner, p. 178. CAM Air is a company operated within CAM. Herman, p. 88.

Among the retailers to whom CAM sold Lakewood-branded box fans was Ace Hardware. Rich Neal at Ace and Scott Jackson at CAM exchanged a series of emails in July 2009. PX 21. This was near the end of the fan-selling season and the Supply Agreement was due to expire on December 17, 2009. In other words, CAM was under pressure to liquidate its inventory. "[T]his is a seasonal, time-sensitive product. And if it doesn't hit the market when it's hot, then the value of it drops precipitously. And then, ultimately, you may have to carry it over into the next year. And because of the Supply Agreement. . . . I couldn't carry these over into another year. I had to get rid of them." Herman, p. 62, lines 6–11 and 13–14.

Jackson made an offer to sell Ace the fans at $9 each, and Neal countered with $8.50. In response, Herman and Jackson attempted to get Neal to purchase other types of fans from CAM Air, CAM's new box fan company. PX 21. This is known as bundling ("take this SKU at this price at this volume, and we'll give you this SKU at this price at this volume"). Martin, pp. 279 and 282, lines 21–23.

Jackson wrote, "As a Chicago-based manufacturer and supplier of fans, CA-MAIR has a strong desire to become a strategic partner with ACE. We feel that there is a significant void with the departure of Lakewood and are confident that we are the company to fill this void." PX 21.

It didn't work. Ace bought the Lakewood-branded box fans at $8.50 each, with-

out obligating itself to order anything further from CAM, and CAM took a loss of $340,836 on that sale. Herman, pp. 63–65; PX 14; Skinner, p. 185. Just a few months later, however, Ace did make a commitment to order CAM Air fans. Skinner, pp. 182–185.

After the Rejection Date, CAM continued to purchase parts and materials for use in making Lakewood box fans. In May 2009, CAM purchased over 100,000 pounds of raw plastic for use in the manufacture of 20″ box fans. Stipulated Facts, ¶ 3 1; PX 22.

CAM also purchased motors that Lakewood had ordered, but for which Lakewood never paid the shipping costs. The motors were being held at the shipping company because of non-payment. Herman, p. 59, lines 8–9 ("They were held up in port because of lack of payment for the transit cost."). CAM asked Szilagyi's permission prior to agreeing to purchase those motors. Eventually, having determined that the motors had little "value to a company that was no longer manufacturing fans," Szilagyi did not object to CAM paying the shipper approximately $70,000 and acquiring the motors. Szilagyi, p. 97, lines 15–16; Marshall, p. 11. Szilagyi did not know that the motors bore the Lakewood trademark, he did not have the ability to inspect the motors, and he never asked CAM whether the motors had the trademark on them. *Id.* at pp. 97, 119–120 and 128.

CAM never had the opportunity to use these motors, and still has them in its warehouse. Marshall, pp. 11–12; Herman, p. 59; *see* Stipulated Facts, ¶ 42.

CAM filed a proof of claim in Lakewood's bankruptcy case on May 20, 2009, asserting monetary damages in the amount of at least $3,023,474.00:

- ▇ lost profits on the sale of the Forecasted Products (as defined [in] the Supply Agreement) of no less than $1,400,000;

- ▇ the value of unused raw materials purchased by CAM in reliance on the Supply Agreement in an amount not less than $1,363,358;

- ▇ the value of CAM's cost to install, repair, maintain, and improve the Equipment (as defined in the Supply Agreement) in an amount not less than $260,116;

- ▇ indemnification by [Lakewood] from and against all costs, losses, damages, and any liabilities as a result of CAM's reliance on [Lakewood's] rights in any intellectual property as set forth in the Supply Agreement; and

- ▇ any other amounts due from [Lakewood] under the Supply Agreement.

PX 11.

Between May 27, 2009 and June 16, 2009, CAM manufactured 16,641 Rain Guard box fans. The equipment CAM used to manufacture these Rain Guard box fans included equipment that was sold by the Trustee to Jarden in connection with the sale of Lakewood's operating assets. Stipulated Facts, ¶ 38. These Rain Guard fans were sold between July and September 2009. Skinner, p. 175; PX 15.

CAM stopped manufacturing Lakewood-branded box fans in the middle of June 2009, when certain necessary equipment was removed from its facility. Skinner, page 227.

As of July 20, 2009, CAM had $660,430.12 in raw material and inventory that would have been used to make Lakewood Box Fans. Skinner, p. 188. Of that amount, $290,116.60 was for a supply of WC2500 motors, which are not used in the box fans described in the Supply Agreement. *Id.* CAM acquired these motors

from Lakewood for $3.67 each "during the period of time that we were looking to try to acquire Lakewood. So in exchange for some collateral and some license rights on motors, we provided Lakewood with cash." Skinner, p. 238, lines 16–19.

Between March 27, 2009 and October 31, 2009, CAM sold 429,348 Model 101–NS Lakewood-branded box fans to third parties, including all 108,984 20″ box fans manufactured after rejection of the Supply Agreement. Stipulated Facts, ¶ 40.

In October 2009—after the court had ordered CAM to stop selling Lakewood-branded box fans—CAM sold 310 box fans to Fred Meyer. Herman apologized in court for this "mistake." Herman, pp. 66–67; Skinner, pp. 178–179; PX 18.

As of fall 2010, there are three participants in the domestic box fan market: CAM, Lasko and Jarden. Martin, p. 276. None of these manufacturers are selling Lakewood-branded box fans. Jarden chose "not to sell them under the Lakewood brand until the products that flooded the market have all gone away." Martin, p. 277, lines 3–5. Jarden currently sells box fans under the Holmes name, and has approximately one-sixth of the market. Martin, pp. 277–278.

### CONCLUSIONS OF LAW

When the parties executed the Supply Agreement in December 2008, they looked forward to a fruitful working relationship, envisioning CAM's production of over 1.2 million Lakewood Box Fans for Lakewood to sell. Just over two months later, Lakewood found itself an alleged debtor in U.S. Bankruptcy Court. The Supply Agreement was rejected six weeks after the involuntary bankruptcy filing.

What CAM was left with after these events is the subject of this litigation. Plaintiffs contend that CAM's license to use Lakewood's patents and trademarks was limited and contingent, and at best attached only to 44,720 Lakewood Box Fans. CAM contends that all Lakewood Box Fans it manufactured and sold to third parties were covered by that license, and thus it did not violate any patent or trademark laws after the Supply Agreement was rejected.

At the heart of the parties' dispute is the Supply Agreement, a three page, single spaced contract. Before determining the scope of CAM's license and how it was affected by rejection, the court must decide a threshold issue: Is the Supply Agreement clear and unambiguous? If it is, many of the outstanding issues may be resolved merely by reading the contract. If it is ambiguous, however, the court must resort to consideration of extrinsic evidence.

### I. The Supply Agreement is Ambiguous.

■ The first issue is whether the Supply Agreement is clear and unambiguous. Traditional contract interpretation principles in Illinois require that[ ] an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.

*Air Safety, Inc. v. Teachers Realty Corp.,* 185 Ill.2d 457, 462, 236 Ill.Dec. 8, 706 N.E.2d 882 (1999) (quotation omitted). This is known as the "four corners" method of contract interpretation, and is the controlling approach under Illinois law. *See Lease Mgmt. Equip. Corp. v. DFO P'ship,* 392 Ill.App.3d 678, 685–86, 331 Ill. Dec. 300, 910 N.E.2d 709 (1st Dist.2009).

■ "In applying this rule, a court initially looks to the language of a contract

alone. If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety*, 185 Ill.2d at 462, 236 Ill.Dec. 8, 706 N.E.2d 882 (internal citations omitted). If, however, language in a contract is "reasonably or fairly susceptible to more than one construction," it is ambiguous. *Tishman Midwest Mgmt. Corp. v. Wayne Jarvis, Ltd.*, 146 Ill.App.3d 684, 689, 102 Ill. Dec. 538, 500 N.E.2d 431 (1st Dist.1986) (citation omitted). If the language is ambiguous, then parol evidence may be admitted to resolve the ambiguity.[4]

This court will review only the language of the Supply Agreement in determining whether it contains an ambiguity. If it does, then extrinsic evidence will be considered in order to resolve that ambiguity.

■ In this case, there are four issues addressed by the Supply Agreement for which Plaintiffs argue that the Agreement is unambiguous and CAM argues otherwise: (1) does the license provided by the Supply Agreement extend to the fans that CAM manufactured before the agreement was executed; (2) does that license extend to fans built after Lakewood had no further requirements; (3) does that license extend to manufacture of Rain Guard fans;

and (4) was CAM's remedy for breach limited to retaining Lakewood's equipment?

## A. There is an Ambiguity as to whether the License Provided by the Supply Agreement Extends to the Fans CAM Manufactured before the Agreement Was Executed.

With regard to the first issue, Plaintiffs urge the court to focus on the following sentence in Section A(1) of the Supply Agreement:

> [CAM] shall manufacture, sell and ship Product to Lakewood or Lakewood's customer in accordance with this Agreement and Lakewood's future Purchase Orders consistent with this Agreement. Lakewood's forecast of its requirements for the Product ("Forecasted Products") is attached hereto as *Exhibit A*.

This sentence begins with "Supplier shall manufacture," implying that in the future, CAM will begin to make Lakewood box fans. As a result, argue Plaintiffs, the Supply Agreement could not reasonably be interpreted to extend the license to fans that CAM manufactured prior to December 17, 2008.

---

4. Some Illinois appellate courts have applied a "provisional admission" approach to determining whether an ambiguity exists. "Under this method, an extrinsic ambiguity exists when someone who knows the context of the contract would know if the contract actually means something other than what it seems to mean." *Air Safety*, 185 Ill.2d at 463, 236 Ill.Dec. 8, 706 N.E.2d 882 (quotation omitted).

In *Air Safety*, the Illinois Supreme Court declined to adopt the provisional admission approach because the contract under review contained an *explicit* integration clause. The court noted in a footnote, however, that it "expressly decline[d] to rule on whether the provisional admission approach may be applied to interpret a contract which does not contain an integration clause until such a case is squarely before the court." *Id.* at 464 n. 1, 236 Ill.Dec. 8, 706 N.E.2d 882.

Subsequent Illinois Appellate Court decisions are not consistent on the question of whether the "provisional approach" may be applied. *Compare Gassner v. Raynor Mfg. Co.*, 409 Ill.App.3d 995, 1007–10, 350 Ill.Dec. 246, 948 N.E.2d 315 (2d Dist.2011) *with Bright Horizons Children's Ctrs., LLC v. Riverway Midwest II, LLC*, 403 Ill.App.3d 234, 247–48, 341 Ill.Dec. 883, 931 N.E.2d 780 (1st Dist. 2010). This court acknowledges the conflict, but need not take a position on the issue as the Supply Agreement is ambiguous under the "four corners" approach.

While this is a reasonable interpretation of that sentence, its apparent clarity is belied by the sentence just above, in the introductory section of the Supply Agreement:

> [CAM] is an Illinois limited liability company, with offices at 4500 West 47th Street Chicago, IL. 60632. [CAM] manufactures fans and/or components and parts for fans as described on *Exhibit A* attached hereto ("Product").

In this introductory section, the contract acknowledges that CAM is already in the business of manufacturing fans and/or components and parts for fans, as described in the forecast of Lakewood's future requirements, which is attached as Exhibit A. CAM is not just in the business of manufacturing fans—it is in the business of manufacturing the exact fans described in the exhibit to the Supply Agreement. It has already begun manufacturing Lakewood Box Fans.

Consequently, even if Section A(1) indicates that CAM *will* manufacture Lakewood Box Fans in the future, the introductory paragraph indicates that CAM is *already* making Lakewood Box Fans.

This issue is further confused by the language of the contract at Section B(3). In defining a remedy for CAM, the parties wrote:

> It is expressly agreed that [CAM] shall not be obligated to return said Equipment to Lakewood unless and until Lakewood purchases all Product which has been previously manufactured by Supplier as of the date that Supplier receives written notice from Lakewood requesting the return of the Equipment.

The parties had agreed that certain equipment would be placed in CAM's facilities. In the paragraph quoted above, the parties further agreed that CAM would not have to return the Equipment "until Lakewood purchases all Product" that CAM had "previously manufactured." Does this language encompass the Lakewood Box Fans that CAM made prior to the execution of the Supply Agreement? Remember, the language of the contract in the introductory section indicated that CAM currently manufactures Product. What is the court to make of the requirement that Lakewood purchase "Product which has been previously manufactured?"

Moreover, the Supply Agreement contains an additional ambiguity regarding the definition of Product. In the introductory section, Product is defined as "fans and/or components and parts for fans as described on Exhibit A." But the second sentence of Section A(1), quoted above, states that Exhibit A is actually "Lakewood's forecast of its requirements for the Product" and defines Exhibit A as "Forecasted Products."

It is far from clear from the language of the Supply Agreement whether CAM was already manufacturing the Product, or even the Forecasted Products, as described in the introductory section, or whether the Supply Agreement meant to state that CAM would begin manufacturing the Forecasted Product after December 17, 2008. Both interpretations are reasonable.

Within the four corners of the Supply Agreement, there is an ambiguity as to whether the contract encompasses those Lakewood Box Fans manufactured prior to its execution. The court must consider extrinsic evidence to resolve this issue.

**B. There is an Ambiguity as to whether the License Extends to the Fans CAM Manufactured after Lakewood Had No Further Requirements.**

Plaintiffs argue that two sections of the Supply Agreement indicate that the

Agreement only authorized CAM to manufacture fans to satisfy Lakewood's requirements:

> It is acknowledged that [CAM] may elect, in [CAM's] sole discretion, to use said Equipment to manufacture Product in advance and prior to receiving purchase orders from Lakewood so as to build up an inventory to *satisfy the requirements* for the Forecasted Products.

Section B(3) (emphasis added).

And part of Section C(3), which describes CAM's license, provides: "In consideration of [CAM] proceeding with the manufacture of the volume of Product set forth in the Forecasted Products *so as to better serve Lakewood's requirements . . .*" (Emphasis added.)

But while the Supply Agreement states that Lakewood must order its actual requirements from CAM up to the forecasted amount, it does not explicitly state that CAM must manufacture Lakewood Box Fans to Lakewood's actual requirements, no more and no less. Instead, the first sentence of Section A(1) provides that CAM "shall manufacture, sell and ship Product to Lakewood or Lakewood's customer in accordance with this Agreement and Lakewood's future Purchase Orders consistent with this Agreement."

What does it mean that CAM shall manufacture the Product in accordance with the Supply Agreement? It might mean that, as Plaintiff argues, that CAM must produce Product to Lakewood's actual requirements, since the Supply Agreement provides at Section C(3) that CAM is manufacturing "so as to better serve Lakewood's requirements." Or it could mean that CAM must manufacture Product in accordance with the forecast attached as Exhibit A, which is only Lakewood's forecasted requirements, and not its actual requirements.

Within the four corners of the Supply Agreement, there is an ambiguity as to the quantity of goods that CAM was obligated to supply. The court must consider extrinsic evidence to resolve this issue.

### C. There is an Ambiguity as to whether the License Extends to the Manufacture and Sale of Rain Guard Fans.

The Supply Agreement makes no mention of Rain Guard fans, thus Plaintiffs argue that there can be no ambiguity; Rain Guard fans were not covered by the Supply Agreement. The forecast attached to the Supply Agreement as Exhibit A references simply "20″ Box Fans."

■ On its face, the term "20″ Box Fans" appears unambiguous. But testimony was taken at trial indicating that both Rain Guard fans and 101–NS fans are 20–inch box fans. The court need not resort to the "provisional admission" approach described in footnote 3, however, in order to take this fact into account. "[C]ontract terms need not be found to be ambiguous before evidence of the custom and usage of the terms in the parties' trade or practice can be considered." *Intersport, Inc. v. Nat'l Collegiate Athletic Ass'n*, 381 Ill.App.3d 312, 319, 319 Ill.Dec. 261, 885 N.E.2d 532 (1st Dist.2008). *See* 12 Williston on Contracts, § 34:1 (4th ed. 2011) ("Thus, in some instances, terms which are unambiguous on their face may be ambiguous or uncertain as a matter of fact, such as where the terms used have both an ordinary meaning and a special trade meaning. In these instances, evidence of usage may be admitted to show that the words employed in a contract, while unambiguous on their face, and having a well-known meaning in their ordinary sense, have acquired by usage of trade a peculiar and different meaning with reference to the general dealing of the trade or profession, and that they were so used in the contract in question."). *See also* Richard Posner, *The Law and Eco-*

*nomics of Contract Interpretation,* 83 Texas L. Rev. 1581, 1599 (May 2005) ("That there were two ships *Peerless* which could have transported the cotton that was the subject of the contract was a readily verifiable fact, in contrast to the unverifiable assertion of an interested party. Similarly, dictionaries, articles, treatises, and evidence of custom or trade usage that gives special meaning to words that a reader of the contract, ignorant of the trade, might suppose were being used in their everyday sense are objective sources of facts because they are not within the parties' control.")

Therefore, even though the term "20″ Box Fans" seems facially unambiguous, the court may consider testimony that in fact the phrase is more meaningful that it first appears. Indeed, Skinner testified that "[t]here were two styles of 20–inch box fans ... [CAM] made both of them at one point or another.... There is a 101 NS, which is a 20–inch box fan, and there's an R225, which is a premium style 20–inch box fan." Furthermore, the parties stipulated that both the 101NS and the Rain Guard are 20″ box fans.

When a contract term is susceptible to more than one meaning, as is the term "20″ Box Fans," then it is ambiguous. *Air Safety,* 185 Ill.2d at 462, 236 Ill.Dec. 8, 706 N.E.2d 882. Therefore, the court must consider extrinsic evidence in order to determine whether the Supply Agreement included both 101–NS fans and Rain Guard fans.

### D. There is an Ambiguity as to Whether CAM's Remedy for Leftover Parts and Materials Was Limited to Retaining Lakewood's Equipment or Extended to Manufacture and Sale of Fans with Those Parts and Materials.

Plaintiffs argue that the Supply Agreement provides an unambiguous and explicit remedy in the event CAM is left holding parts and materials:

> It is expressly agreed that [CAM] shall not be obligated to return said Equipment to Lakewood unless and until Lakewood purchases all Product which has been previously manufactured by [CAM] as of the date that [CAM] receives written notice from Lakewood requesting the return of the Equipment. *In addition, [CAM] shall not be obligated to return said Equipment to Lakewood unless and until Lakewood:* (i) reimburses [CAM] for all installation costs incurred by [CAM] when [CAM] installed the Equipment; (ii) *reimburses and buys from [CAM] all raw materials and parts purchased by [CAM] to make the Forecasted Product;* and (iii) pays to [CAM] any other amounts due from Lakewood to [CAM] under this Agreement. Any removal of the Equipment by Lakewood permitted under this Agreement shall be done at Lakewood's sole cost and expense.

Section B(3) (emphasis added).

Because the Supply Agreement provided CAM with a specific remedy—holding the Equipment hostage—Plaintiffs argue that there is no ambiguity as to whether the Supply Agreement also gave CAM a license to manufacture new fans with raw materials and parts on hand.

But the remedy of retaining the Equipment only springs into existence after CAM "receives written notice from Lakewood requesting the return of the Equipment." The Supply Agreement provided CAM with another remedy at Section C(3):

> In consideration of [CAM] proceeding with the manufacture of the volume of Product set forth in the Forecasted Products so as to better serve Lake-

wood's requirements, and in the event that Lakewood fails to purchase all of the Forecasted Products from [CAM], for any reason whatsoever (within 30 days after the end of each of the respective months on the list of Forecasted Products) then Lakewood hereby agrees that [CAM] may sell any and all of such Forecasted Product manufactured by [CAM] in advance and not purchased by Lakewood, in Lakewood's packaging and under Lakewood's name, to any customer whatsoever, including, but not limited to, any customers of Lakewood. Lakewood hereby grants to [CAM] a license for such purpose, which license shall expire upon [CAM's] sale of all such remaining Forecasted Product not previously purchased by Lakewood in the time frame indicated above.

The foregoing license shall survive any termination or expiration of this Agreement.

This is the section that created the hotly-disputed license at the center of the parties' dispute. Is the license granted in Section C(3) *in addition to* the specific remedy of holding the Equipment hostage, or is it meant to cover only the period before Lakewood requested return of the Equipment? Within the four corners of the Supply Agreement, there is an ambiguity as to the extent of CAM's available remedies when it was left with raw materials and parts purchased to make Lakewood Box Fans. The court must consider extrinsic evidence to resolve this issue.

## II. *Interpretation of the Supply Agreement Using Extrinsic Evidence.*

■ Since the Supply Agreement is "reasonably or fairly susceptible to more than one construction," it is ambiguous. *Tishman Midwest Mgmt.,* 146 Ill.App.3d at 689, 102 Ill.Dec. 538, 500 N.E.2d 431 (citation omitted). When a contract is ambiguous, "parol evidence is admissible to ascertain the parties' intent." *Quake Constr., Inc. v. Am. Airlines, Inc.,* 141 Ill.2d 281, 288, 152 Ill.Dec. 308, 565 N.E.2d 990 (1990) (citation omitted). If no ambiguity existed, construction of the contract would be a matter of law. But when contract language is ambiguous regarding the parties' intent, the interpretation of that language is a question of fact. *Id.* at 288–89, 152 Ill.Dec. 308, 565 N.E.2d 990 (citation omitted). As the trier of fact in this case, this court must consider parol evidence in resolving the ambiguity.

The situation before the court today differs from most contract disputes in one critical aspect. In many such cases, the parties to a contract disagree as to the meaning of the contract they themselves negotiated (although their disagreement does not necessarily mean that the contract is ambiguous).

■ This is not the problem facing the court today. The parties who wrote this contract are in nearly complete agreement as to their intent.[5] It is only the Trustee and a third party, entities who were not present when the Supply Agreement was

---

5. Plaintiff asserts that the court should draw a negative inference from CAM's failure to call attorney Bruce Waldman, who represented CAM in the Supply Agreement negotiations. *See Chicago Coll. of Osteopathic Med. v. George A. Fuller Co.,* 719 F.2d 1335, 1353 (7th Cir.1983) (the "missing witness" rule provides that when a party has it peculiarly within its power to call a witness but does not do so, an inference arises that the testimony

would be unfavorable.) CAM points out, however, that the Trustee and Jarden could have called Waldman themselves. *See Oxman v. WLS–TV,* 12 F.3d 652, 661 (7th Cir.1993) ("Before a party can argue to the trier of fact that an adverse inference should be drawn from another party's failure to call a witness, the complaining party must establish that the missing witness was peculiarly in the power of the other party to produce.") The Plain-

written, who dispute its meaning. They argue that the Supply Agreement is unambiguous, and that the testimony about the parties' intent is irrelevant because the language of the contract provides all the information we need.

As described above in Section I the court, which is also a Johnny-come-lately to this dispute, disagrees with the Plaintiffs' assertion that the Supply Agreement is an unambiguous document. It is entirely possible that the parties who were present during its negotiation, and who were involved in the day-to-day activities at CAM and at Lakewood, believed it to be clear. But to a third party such as the court, the Supply Agreement falls far short of being a model of clarity.

 This is why the testimony of those parties who were present at the time the Supply Agreement was negotiated and executed is so crucial, and why this case so clearly needs the introduction of extrinsic evidence. The court finds the Supply Agreement ambiguous on its face, merely by reading the language of the contract. Not only is the Supply Agreement ambiguous, however, but the testimony produced at trial indicates that the parties who negotiated the Supply Agreement agree about their intent, and about what they wanted this contract to accomplish. It would be ostrich-like for the court to ignore their consensus.

> In Illinois, the primary object in construing a contract is to give effect to the intention of the parties.... When considering extrinsic evidence, the factfinder should focus, in descending order of importance, on: (1) the parties' negotiations over the contract at issue; (2) their course of performance; (3) their prior

course of dealing; and (4) trade usage in the relevant industry.

*Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 701 (7th Cir.2002) (internal quotations omitted).

In this case, the court heard a great deal of testimony regarding the parties' negotiations. The parties submitted very little evidence regarding the course of performance, as only two months elapsed between the execution of the Supply Agreement and the filing of the involuntary petition against Lakewood. This was the parties' first transaction, so there is no prior course of dealing to examine, and there are no gaps in the agreement that might be filled with reference to trade usage in the relevant industry.

Therefore, the court will rely most heavily on the testimony about the negotiations. The witnesses most involved in the negotiation of the Supply Agreement were Barron and Skinner. Based on their testimony, as well as on corroborating testimony from Herman, the court concludes: (1) the license provided by the Supply Agreement extends to the fans that CAM manufactured before the agreement was executed; (2) the license extends to fans built after Lakewood had no further actual requirements; (3) the license extends to manufacture of Rain Guard fans; and (4) CAM's remedy for breach was not limited to retention of Lakewood's equipment.

## A. The License Provided by the Supply Agreement Extends to the Fans CAM Manufactured before the Agreement Was Executed.

 Plaintiffs correctly point out that the Supply Agreement does not explicitly

---

tiffs deposed Waldman and presumably knew the contents of his testimony. Moreover, the missing witness rule is inapplicable where the evidence would be cumulative, *United States v. Mahone*, 537 F.2d 922, 927 (7th Cir.), *cert.*

*denied,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976), which CAM argues it would have been. Therefore, the court draws no inference, negative or otherwise, from CAM's failure to call Waldman.

discuss the status of fans manufactured prior to the execution of that agreement. But as the court determined in its analysis above, the Supply Agreement is ambiguous on this point. Its failure to discuss specifically the fate of the 70,637 manufactured fans in CAM's inventory on December 17, 2008, does not compel the conclusion that those fans were not covered by the contract. Instead, the court must review the available extrinsic evidence in order to determine the intent of the parties with respect to the previously manufactured fans.

Both Skinner and Barron testified to their understanding that the Supply Agreement included fans that were already in inventory when the contract was signed. Although the Supply Agreement was signed in mid-December 2008, and although Lakewood told CAM that it should be a month ahead of the forecast in its production, the Supply Agreement forecast contained fan requirements for December 2008 and January 2009. This is consistent with the parties' understanding that the Supply Agreement included fans that were already in inventory when the contract was signed.

CAM needed to manufacture fans well before the month in which Lakewood required those fans to be sure that CAM had enough finished goods for the peak season. Both Skinner and Barron testified that this is why the Supply Agreement contained paragraph B(3), which explicitly gave CAM the right to manufacture product in advance—so that CAM could build up its inventory levels to meet the forecast. Lakewood recognized that CAM's manufacturing facility was not large enough to make the number of fans the forecast required in the high-volume months.

Barron, who negotiated the Supply Agreement on behalf of Lakewood, testified that "yes, it [the 2008 Fans] would be covered under this [the Supply Agreement], but it wasn't something that would have been separately discussed." The court finds that the 2008 Fans, already manufactured at the time CAM and Lakewood entered into the Supply Agreement, were included in the agreement.

### B. The License Extends to the Fans CAM Manufactured after Lakewood Had No Further Requirements.

 As described above, Plaintiffs argue that Sections B(3) and C(3) of the Supply Agreement indicate that the Agreement authorized CAM to manufacture fans only to satisfy Lakewood's actual requirements. If Lakewood had no actual requirements, argue Plaintiffs, then CAM would have to stop manufacturing.

 Because the Supply Agreement is ambiguous on this point, the court must consider extrinsic evidence to determine whether it is in fact a "requirements contract." This is a contract for the sale of goods, and as such is governed by the Uniform Commercial Code, as adopted by the State of Illinois. The quantity of goods that a buyer agrees to purchase is generally an essential term of a sale contract. But in a requirements contract, the buyer agrees to purchase not a specific amount, but instead to purchase the subject goods exclusively from the seller. 810 Ill. Comp. Stat. 5/2–306 (West 2011) permits a valid contract to contain "[a] term which measures the quantity by the output of the seller or the requirements of the buyer" rather than a certain and definite amount.

In Section A(1), the parties wrote:

Lakewood agrees to order all of its actual requirements for the Product, up to the amounts set forth in the forecast,

from [CAM] and not from any other supplier or source.

Therefore, Lakewood was required to purchase all the Lakewood Box Fans it required exclusively from CAM, up to the forecasted amounts. If Lakewood's requirements exceeded the forecasted amounts, presumably it could order box fans from another supplier.

■ Consequently, the Supply Agreement is a requirements contract. "[A]n essential element of a requirements contract is the promise of the buyer to purchase exclusively from the seller either the buyer's entire requirements or up to a specified amount." *Mid–South Packers, Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1120 (5th Cir.1985) (citations omitted). Lakewood promised to purchase its requirements up to a specified amount.

■ If Lakewood obligated itself to purchase its requirements from CAM, "that triggered the reciprocal obligation to supply those requirements...." *Miller v. McLean County Unit Dist. No. 5 & Champaign Cmty. Sch. Dist. 4 (In re Modern Dairy of Champaign, Inc.)*, 171 F.3d 1106, 1108 (7th Cir.1999). So CAM was obligated to supply those requirements. But was it required to stop manufacturing once it learned that Lakewood had no further requirements? On this point neither the common law nor the UCC is helpful, and the Supply Agreement even less so. The court could locate (and the parties supplied) no case law on point, which makes sense—usually when a buyer stops purchasing, the manufacturer stops making goods and sues for breach.

Therefore, the court turns to the extrinsic evidence. The extrinsic evidence supports the conclusion that no matter what Lakewood was purchasing, the intent of the parties was that CAM was obligated to manufacture to the forecast. Skinner testified that it was CAM's "responsibility to make sure that we produced ahead of the forecast. So whatever the sales were on their end, we were told strictly focus on the forecast, make to the forecast." Barron testified that CAM "had to make what we requested."

Requiring CAM to produce to the forecast is also the most logical result from a business perspective. Herman testified that

as a manufacturer, you need to gain some efficiencies, and the only way we could do it is to run it the way we have it laid out.... To put that kind of investment into doing actual, where one month it's this, it's that, you cannot—you can't create an efficient flow of product and still expect to be able to hit the stores with the amount that they are required to.

Finally, concluding that CAM was allowed to manufacture only to Lakewood's requirements would result in a construction that is inconsistent with another section of the Supply Agreement. The contract provided CAM with the remedy of a license to sell product Lakewood failed to buy—product it did not actually require. If the parties intended for CAM to stop manufacturing when Lakewood had no actual requirements, then this remedy of the license to sell would be unnecessary. CAM would have stopped manufacturing and would have no excess product to sell. Therefore, finding that CAM was required to stop manufacturing once it learned that Lakewood had no further requirements would result in an absurdity, and is further support for the conclusion that CAM was required to produce only to the forecast, not to Lakewood's actual requirements.

The court concludes that even if the Supply Agreement is a "requirements contract," under which Lakewood was obligated to purchase all of its requirements up to

the forecasted amount, CAM was obligated to manufacture according to the forecast attached to the Supply Agreement as Exhibit A.

### C. The License Extends to the Manufacture and Sale of Rain Guard Fans.

██ The forecast attached to the Supply Agreement as Exhibit A references simply "20″ Box Fans." Therefore, Plaintiffs argue that the Supply Agreement described only 101–NS fans. As described above, however, testimony was taken at trial indicating that both Rain Guard fans and 101–NS fans are 20–inch box fans. Therefore, the court will consider the testimony of the individuals who negotiated the Supply Agreement to determine whether they intended the agreement to include Rain Guard fans as well as 101–NS fans.

Barron testified that the parties' understanding was that Lakewood wanted CAM to manufacture Rain Guard fans and that "the Rain Guard would have been covered under this agreement." At the time the agreement was signed, however, Lakewood didn't know how many Rain Guard fans it wanted, or when they would be needed. Instead, the number of fans in the forecast that would need to be Rain Guard fans would be communicated at a later date. CAM understood that Rain Guard fans would be a very small portion of Lakewood's purchases.

Indeed, approximately six weeks after the Supply Agreement was signed, Lakewood provided CAM with a revised forecast that separated out the number of Rain Guard fans. The parties even stipulated prior to trial that Lakewood requested that CAM manufacture Rain Guard fans for at least one Lakewood customer, and Lakewood provided CAM with materials, specifications and information necessary for CAM to manufacture these Rain Guard fans. Why would Lakewood have provided CAM with the items necessary for manufacturing Rain Guard fans, and revised the forecast to include Rain Guard fans, if it did not intend for CAM to manufacture them?

Therefore, the court finds that the Supply Agreement extends to Rain Guard fans.

### D. CAM's Remedies for Leftover Parts and Materials Included a License for the Manufacture and Sale of Fans with Those Parts and Materials.

██ As discussed above in Section I(D), there is an ambiguity in the Supply Agreement as to the extent of CAM's available remedies.

Section B(3) gives CAM the right to retain the Equipment until Lakewood purchased all of the Lakewood Box Fans CAM had manufactured to date. CAM could also wait for Lakewood to reimburse it for all installation costs, raw materials and parts, and any other amounts due under the Supply Agreement before returning the Equipment.

But Section C(3) gave CAM a different remedy. If Lakewood failed to purchase all of the forecasted box fans by the end of a particular month, then 30 days after the end of the month CAM was granted a license to sell any and all of that Forecasted Product which it had previously manufactured. The license expired when CAM sold all of the remaining Forecasted Product that Lakewood did not purchase within the month, and it survived any termination or expiration of the Supply Agreement.

Plaintiff now argues that because Section B(3) provides a specific remedy for CAM if it is left holding parts or materials, the license in Section C(3) did not authorize CAM to manufacture fans with those

parts on hand and to sell them later. Moreover, CAM filed a proof of claim that included a claim for "the value of unused raw materials purchased by CAM in reliance on the Supply Agreement in an amount not less than $1,363,358."

As CAM points out, however, the license was created "[i]n consideration of [CAM] proceeding with the manufacture of the volume of Product set forth in the Forecasted Products." Section C(3). And CAM was authorized to manufacture fans in advance of the forecasted months; indeed, it was expected to do so in order to have sufficient fans on hand. So if Lakewood failed to purchase fans one month, CAM was not expected to stop manufacturing from parts on hand. CAM could use the license to sell previously manufactured fans while it continued to manufacture Lakewood Box Fans in accordance with the forecast.

Indeed, the license to sell, and the ability to retain the Equipment, need not be mutually exclusive. Even while CAM held on to the Equipment, it could mitigate its damages by using the license granted by the Supply Agreement. The license to sell reset each month during the forecast period, depending on the number of box fans Lakewood purchased. Each month CAM continued to manufacture to the forecast, and each month there was a possibility that a license to sell the unpurchased box fans would spring into existence.

This interpretation of the Supply Agreement is not just consistent with the intent of the parties; it makes sense from a business perspective. The witnesses testified repeatedly that the purpose of the license to sell was to protect CAM's investment, an investment it made for Lakewood's benefit. It is entirely appropriate, therefore, that in turn Lakewood would give CAM a broad license to sell the fans. As Barron testified, "the agreement does not say that, but, yes. At the time, I would have thought that [CAM] could complete what they had in hand, because the purpose was that they would not be out of cash as a result of making the fans for us."

The Supply Agreement provided CAM with a license to sell completed fans in inventory if Lakewood had not purchased those fans within 30 days after the end of the applicable month. CAM continued to manufacture box fans each month for the forecast, and each month that Lakewood did not purchase the forecasted fans, CAM had the right to sell those previously manufactured fans. The remedy of retaining the Equipment did not preclude CAM from continuing to manufacture to the forecast with the parts it had on hand.

Therefore, the court concludes that CAM's remedy for leftover parts and materials was not limited to retention of the Equipment. The Supply Agreement also created a license CAM could use to sell unpurchased fans each month, even while it continued manufacturing according to the forecast in Exhibit A.

For all of the reasons stated above, the court finds: (1) the license provided by the Supply Agreement extends to the fans that CAM manufactured before the agreement was executed; (2) the license extends to fans built after Lakewood had no further actual requirements; (3) the license extends to manufacture of Rain Guard fans; and (4) CAM's remedy for breach was not limited to retention of Lakewood's equipment.

### III. *Rejection of the Supply Agreement Did Not Terminate the License Granted to CAM Under the Supply Agreement.*

According to 11 U.S.C. § 365(a), with certain exceptions not relevant here, a trustee "may assume or reject any execu-

tory contract or unexpired lease of the debtor." The Supply Agreement was an executory contract on the petition date, and Szilagyi rejected it on March 27, 2009. The Bankruptcy Code provides that this rejection "constitute[d] a breach ... immediately before the date of the filing of the petition." 11 U.S.C. § 365(g)(1). Therefore, Szilagyi's rejection of the Supply Agreement breached that contract, and left CAM with certain rights. What effect did rejection of the Supply Agreement have on the license it granted CAM to use Lakewood's patents and trademark?

In 1985, the Fourth Circuit held that rejection of a technology license deprived the non-debtor party of all rights under that license. The licensee "would be entitled to treat rejection as a breach and seek a money damages remedy; however, it could not seek to retain its contract rights in the technology by specific performance even if that remedy would ordinarily be available upon breach of this type of contract." *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1048 (4th Cir.1985), *cert. denied*, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986). This is exactly the result that Plaintiffs urge in this case. See Pl. Post–Trial Br., ECF No. 202, pp. 18–24.

In response to the *Lubrizol* decision, however, Congress enacted 11 U.S.C. § 365(n):

(1) If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect—

(A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or

(B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property ..., as such rights existed immediately before the case commenced, for—

(i) the duration of such contract; and

(ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

(2) If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, under such contract—

(A) the trustee shall allow the licensee to exercise such rights;

(B) the licensee shall make all royalty payments due under such contract for the duration of such contract and for any period described in paragraph (1)(B) of this subsection for which the licensee extends such contract; and

(C) the licensee shall be deemed to waive—

(i) any right of setoff it may have with respect to such contract under this title or applicable nonbankruptcy law; and

(ii) any claim allowable under section 503(b) of this title arising from the performance of such contract.

This section provides special protection to non-debtor parties when the debtor is a

licensor of a right to intellectual property. According to 11 U.S.C. § 101(35A), "intellectual property" includes patents, so the first issue for this court is this: After rejection of the Supply Agreement, did CAM retain its rights to use Lakewood patents in the manufacture and sale of Lakewood Box Fans, or did it elect to treat the Supply Agreement as terminated?

### A. After Rejection, CAM Retained its Rights under the Supply Agreement to Use Lakewood's Patents.

■ Plaintiffs argue that CAM cannot assert that it retained its rights to the patent licenses under § 365(n)(1)(B) because if it had done so, § 365(n)(2)(C) forced CAM to waive any § 503(b) claim. Since CAM obtained allowance and payment of an administrative expense claim, it cannot assert that it retained its rights as a patent licensee.

CAM filed a proof of claim against Lakewood's bankruptcy estate asserting monetary damages in the amount of at least $3,023,474.00:

- ■ lost profits on the sale of the Forecasted Products (as defined in the Supply Agreement) of no less than $1,400,000;
- ■ the value of unused raw materials purchased by CAM in reliance on the Supply Agreement in an amount not less than $1,363,358;
- ■ the value of CAM's cost to install, repair, maintain, and improve the Equipment (as defined in the Supply

Agreement) in an amount not less than $260,116;

- ■ indemnification by Lakewood from and against all costs, losses, damages, and any liabilities as a result of CAM's reliance on Lakewood's rights in any intellectual property as set forth in the Supply Agreement; and
- ■ any other amounts due from Lakewood under the Supply Agreement.

CAM and Szilagyi eventually compromised the proof of claim, reaching a settlement approved by this court which allowed CAM: (1) to be paid $190,000 out of a holdback fund from the sale to Jarden; (2) an administrative claim of $120,000; and (3) a general unsecured non-priority claim in the amount of $850,000. The settlement also resulted in the dismissal of two counts of this complaint.

This proof of claim was the only claim CAM filed against the estate. CAM never filed a request for payment of administrative expense.[6] Instead, pursuant to a negotiated resolution with the Trustee, CAM was allowed a claim that would have administrative expense priority. Moreover, it was not a claim "arising from the performance" of the Supply Agreement, but was based instead upon CAM's storage of, repairs to and maintenance of the Equipment and other assets ultimately sold to Jarden.

Nevertheless, Plaintiffs assert that CAM's willingness to settle its proof of claim necessarily demonstrates that CAM elected to treat the Supply Agreement as

---

**6.** Requests for administrative expenses are not filed as proofs of claim. *In re marchFirst, Inc.,* 448 B.R. 499, 508 (Bankr.N.D.Ill.2011) ("an administrative expense request is not a 'claim' and so is not property asserted in a proof of claim.") (quotation omitted). The official form for filing a proof of claim specifically states that it is not to "be used to make a claim for an administrative expense arising after the commencement of the case." *See* Official Bankruptcy Form B 10 (04/10) *available at http://www.uscourts.gov/uscourts/Rules AndPolicies/rules/BK_Forms_Official_2010/B_ 010_0410.pdf* (last visited September 23, 2011).

terminated under § 365(n)(1)(A). Having made such an election, Plaintiffs contend that CAM cannot also retain its rights under the Supply Agreement.

■■■ This contention begs the question that a licensee who elects to retain its rights rather than treat the contract as terminated cannot have any claims against the debtor-licensor for which a proof of claim may be filed. Licensees who retain their rights waive § 503(b) claims (as well as rights of setoff), but nowhere does the statute state that such licensees waive all other claims as well.

According to the Bankruptcy Code, the term "claim" means the

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

Licensees who retain their rights and do not choose to treat rejected intellectual property contracts as terminated may still have rights to payment or rights to equitable remedies against the bankruptcy estate, because rejection of such contracts still constitutes a breach under § 365(g). Indeed, the court can infer that from the fact that § 365(n)(2)(C) specifically provides that licensees who retain their rights waive rights of setoff and § 503(b) claims means that such licensees have *not* waived their rights to other claims against the estate.

As CAM argues, it had "multiple claims for separate events." CAM Resp. to Pl. Post–Trial Br., 09 A 341, ECF No. 206, at p. 4, n. 1. CAM retained its rights to use the patent license, but since rejection breached the Supply Agreement, CAM also filed a proof of claim asserting monetary damages in the amount of at least $3,023,474.00.

Congress anticipated that a licensee who elects under section 365(n)(1)(B) to retain its license rights "will still retain a general claim for damages from rejection, as a breach of contract under section 365(g) of the Bankruptcy Code— though actual damages may be less if the licensee elects to proceed under (n)(1)(B) rather than under (n)(1)(A), since the licensee still retains its rights to the intellectual property under (n)(1)(B)." H.R.Rep. No. 1012, 100th Cong., 2d Sess. (1988) (8 *Norton Bankruptcy Law and Practice 2d,* at 371)[.] *In re Quad Sys. Corp.,* No. 00–35667F, 2001 WL 1843379, at *13 (E.D.Pa. Mar. 20, 2001). Therefore, the filing and negotiated resolution of CAM's proof of claim does not lead inexorably to the conclusion that CAM elected to treat the Supply Agreement as terminated.

Plaintiffs then argue that even if CAM did retain its rights, it could only retain those rights "as such rights existed immediately before the case commenced." § 365(n)(1)(B). Just before this case commenced, CAM held a license with respect to Lakewood's patents that would spring into effect if Lakewood failed to purchase its monthly forecasted requirements within 30 days. Since the patent had not sprung into effect for future months, Plaintiffs contend that there were no rights to retain as to those months.

In support of this contention, Plaintiffs argue that the reading of § 365(n)(1)(B) described in *In re Storm Technology, Inc.,*

260 B.R. 152 (Bankr.N.D.Cal.2001), controls. In that case, Logitech sold its scanner patents to Storm Technology. *Id.* at 154. Storm paid in part with cash and in part with a promissory note. *Id.* The parties agreed that if Storm did not pay the note in full by a certain date, Logitech would have a "worldwide, non-exclusive royalty-free, fully paid-up license." *Id.*

Prior to the due date, Storm filed for relief under Chapter 11. *Id.* The case was converted to Chapter 7, and the trustee filed a motion to sell the estate's patents. *Id.* The due date then passed without payment of the note, and Logitech filed a limited objection to the sale, asserting a license in those patents. *Id.* at 154–55.

The parties agreed that to the extent the agreement between them was executory, it was deemed rejected. *Id.* at 156. Logitech then asserted that § 365(n)(1)(B) gave it the choice to retain its rights under the agreement. *Id.* at 157. The bankruptcy court, relying on the language in § (n)(1)(B) that provides that non-debtor parties retain rights only as they "existed immediately before the case commenced," found that on the petition date Logitech had "merely a contingent right to a license upon a default on the debtor's payment obligation." *Id.* Since it had no enforceable license in the patents as of the petition date, it could not assert a license in the patents at the time of rejection. *Id.*

While the licenses in both *Storm Technology* and in this case relied upon the occurrence of a condition precedent, Logitech held its potential license as a remedy for non-payment on a note. In contrast, CAM was manufacturing goods using the very intellectual property that would be the subject of any future license. CAM points out that Logitech had made no investment at the time the bankruptcy case commenced. By contrast, CAM had spent over a million dollars before the involuntary petition was filed, investing in at least 60 days' inventory and making substantial changes to its infrastructure.

In evaluating situations where the licensee clearly had some rights to the IP as of the petition date, other courts have taken the "state of the IP" approach and held that upon the licensee's exercise of its rights under section 365(n), it would be entitled to use the license in the state in which the intellectual property existed as of the filing of the petition. ***In other words, improvements to the IP made by the licensor after the filing of the petition would not be available to the licensee.*** This perspective is consistent with the approach set forth in *In re Storm Technology.* Moreover, this interpretation is arguably also consistent with section 365(g)(1), which provides that the rejection of an executory contract "constitutes a breach of such contract ... immediately before the date of the filing of the petition."

Ron E. Meisler, et al., *Rejection of Intellectual Property License Agreements Under Section 365(n) of the Bankruptcy Code: Still Hazy After All These Years*, 19 J. Bankr. L. & Prac. 2 Art. 4 (March 2010) (footnotes omitted and emphasis added). *See Szombathy v. Controlled Shredders, Inc.,* No. 97 C 481, 1997 WL 189314, at *1 (N.D.Ill. Apr. 14, 1997) (bankruptcy court's conclusion that non-debtor licensee who elected to retain its rights was "not entitled to any modifications or improvements which came into existence subsequent to" the petition date was not disputed on appeal).

 CAM clearly had some rights to this intellectual property as of the petition date; it was using the patents to manufacture Lakewood Box Fans. The court finds that any modifications or improvements made to the patents after the petition date would not have been available to CAM, but

CAM retained its rights to use the patents as they existed on the petition date.

For all of the reasons stated above, CAM's license to use the patents survived rejection, and it retained its rights pursuant to 11 U.S.C. § 365(n)(1)(B).

### B. CAM's License to Use Lakewood's Trademark, Although Not Covered by 11 U.S.C. § 365(n), Survived Rejection of the Supply Agreement.

 Section 365(n) does not apply to trademarks, however, because the Code's definition of intellectual property, found at § 101(35A), does not include trademarks. Several subsequent decisions have reasoned by negative inference that since Congress excluded trademarks from the scope of § 365(n), a subsection written in response to *Lubrizol,* Congress meant for the *Lubrizol* holding to apply to trademarks:

> [S]ince the Bankruptcy Code does not include trademarks in its protected class of intellectual property, *Lubrizol controls and the Franchisees' right to use the trademarks stops on rejection. Raima,* 281 B.R. at 673, n. 24; *see also Chipwich,* 54 B.R. 427 (a pre § 365(n) case citing *Lubrizol* for the principle that only a damage claim arises from the rejection of a trademark license); *Blackstone,* 109 B.R. 557 (a post § 365(n) case holding a trademark licensee is only entitled to a general unsecured claim for the debtor's breach of its executory contract).

*In re HQ Global Holdings, Inc.,* 290 B.R. 507, 513 (Bankr.D.Del.2003) (emphasis added). *See In re Old Carco, LLC,* 406 B.R. 180, 211 (Bankr.S.D.N.Y.2009); *Raima UK Ltd. v. Centura Software Corp. (In re Centura Software Corp.),* 281 B.R. 660, 669–75 (Bankr.N.D.Cal.2002); *In re Chipwich,* 54 B.R. 427, 431 (Bankr.S.D.N.Y.

1985) (rejection deprived the non-debtor party of the right to use two trademarks pursuant to *Lubrizol* ).

But the *Lubrizol* court itself acknowledged serious policy concerns with its own holding:

> It cannot be gainsaid that allowing rejection of such contracts as executory imposes serious burdens upon contracting parties such as Lubrizol. Nor can it be doubted that allowing rejection in this and comparable cases could have a general chilling effect upon the willingness of such parties to contract at all with businesses in possible financial difficulty. But under bankruptcy law such equitable considerations may not be indulged by courts in respect of the type of contract here in issue. Congress has plainly provided for the rejection of executory contracts, notwithstanding the obvious adverse consequences for contracting parties thereby made inevitable. Awareness by Congress of those consequences is indeed specifically reflected in the special treatment accorded to union members under collective bargaining contracts, *see Bildisco,* 465 U.S. at [520–525], 104 S.Ct. at 1193–96, and to lessees of real property, *see* 11 U.S.C. § 365(h). But no comparable special treatment is provided for technology licensees such as Lubrizol. They share the general hazards created by § 365 for all business entities dealing with potential bankrupts in the respects at issue here.

*Lubrizol,* 756 F.2d at 1048.

A recent decision from the Third Circuit contains a concurrence that acknowledges *Lubrizol's* policy concerns. *See In re Exide Techs.,* 607 F.3d 957 (3d Cir.2010). This concurrence must give a court pause before it mechanically follows the line of cases which state that *Lubrizol* controls on the effect of rejection of a license to use trademarks.

In his *Exide* concurrence, Judge Ambro noted that the legislature may have purposely excluded trademarks from the definition of intellectual property in the legislation that followed *Lubrizol*, but Congress did so with a call to arms for bankruptcy courts in the legislative history:

> "[T]he bill does not address the rejection of executory trademark, trade name or service mark licenses by debtor-licensors. While such rejection is of concern because of the interpretation of section 365 by the *Lubrizol* court and others, *see, e.g., In re Chipwich, Inc.,* 54 B.R. 427 (Bankr.S.D.N.Y.1985), such contracts raise issues beyond the scope of this legislation. In particular, trademark, trade name and service mark licensing relationships depend to a large extent on control of the quality of the products or services sold by the licensee. *Since these matters could not be addressed without more extensive study, it was determined to postpone congressional action in this area and to allow the development of equitable treatment of this situation by bankruptcy courts.*"

*Id.* at 966–67 (emphasis added) (quoting S. Rep. 100–505, at 5, *reprinted* in 1988 U.S.C.C.A.N. 3200 at 3204). Judge Ambro chided the lower courts for their failure to heed this call to arms:

> Rather than reasoning from negative inference to apply another Circuit's holding to this dispute, the Courts here should have used, I believe, their equitable powers to give Exide a fresh start without stripping EnerSys of its fairly procured trademark rights. *Cf. In re Matusalem,* 158 B.R. 514, 521–22 (Bankr.S.D.Fla.1993) (suggesting that rejection of a trademark license would not deprive a licensee of its rights in the licensed mark). Courts may use § 365 to free a bankrupt trademark licensor from burdensome duties that hinder its reorganization. They should not—as occurred in this case—use it to let a licensor take back trademark rights it bargained away. This makes bankruptcy more a sword than a shield, putting debtor-licensors in a catbird seat they often do not deserve.

*Id.* at 967–68.

Indeed, Judge Ambro took "pains to distinguish between rejecting a trademark license and rescinding or terminating one." Jonathan C. Balfus, *Exide Inside Out: New Third Circuit Decision Preserves Trademark Licensee's Rights Following Licensor's Rejection Under Bankruptcy Code § 365,* 31 Cal. Bankr. J. 523, 537 (2010).

Plaintiffs filed a post-trial supplement after briefing had concluded, bringing to the court's attention an unpublished order entered by a bankruptcy judge from the District of Delaware. *See* Pl. Mot. to File Supp. Authority, ECF No. 207, Ex. B, *In re Deel, LLC, et al. (f/k/a Magic Brands, LLC),* Case No. 10–11310(BLS), Docket No. 1148 (Bankr.D.Del. Feb. 8, 2011). In this unpublished order, U.S. Bankruptcy Judge Brendan L. Shannon concluded that certain agreements (the Flannery Franchise Agreements), which licensed trademarks, trade names and trade dress, had been validly rejected. *Id.* at p. 12. Without further discussion, he also found that

> Section 365(n) of the Bankruptcy Code is inapplicable to the Flannery Franchise Agreements and any Fuddruckers IP formerly licensed thereunder by the Flannery Parties. No other provision of the Bankruptcy Code or applicable law authorizes the Flannery Parties' continued use of the Fuddruckers IP. Specific enforcement of the Flannery Franchise Agreements is not available to the Flannery Parties. The Flannery Parties' sole remedy for rejection of the Flan-

nery Franchise Agreements is the opportunity to assert a claim or claims against the Debtors' estates pursuant to sections 365(g) and 502(g)(1) of the Bankruptcy Code.

*Id.* at p. 12. This unpublished order is neither binding nor persuasive.[7] Although Plaintiffs included a copy of the transcript from the hearing that led to this order, there is no written record of the legal analysis that is the underpinning of Judge Shannon's conclusion. According to the transcript, Judge Shannon did "not accept, the argument ... that the effect of rejection being a breach rather than a termination of an executory contract allows the non-Debtor counter-party to continue to operate a trademark store on a going-forward basis, following an asset sale and rejection of the franchise agreement." Pl. Mot. to File Supp. Authority, ECF No. 207, Ex. A, Tr. of Omnibus Hearing Before the Honorable Brendan L. Shannon, at 81.

Moreover, the court agrees with Judge Shannon that § 365(n) does not apply to the rejection of trademark licenses. That is why this court must make its determination on equitable grounds, and avoid a situation that "let[s] a licensor take back trademark rights it bargained away." *Exide,* 607 F.3d at 967.

In the absence of controlling authority on this point from the Seventh Circuit, this court is persuaded by Judge Ambro's reasoning. It will not follow, in lockstep fashion, those few trial courts to have decided that the non-binding *Lubrizol* holding is the only possible outcome. Instead of bemoaning the "chilling effect" *Lubrizol* might impose on licensees, the court will step into the breach, as it were, and begin

the "development of equitable treatment" Congress anticipated would occur.

Development of such treatment is consistent with the law of rejection, since "[r]ejection merely frees the estate from the obligation to perform; it does not make the contract disappear." *Cohen v. The Drexel Burnham Lambert Grp., Inc. (In re The Drexel Burnham Lambert Grp., Inc.),* 138 B.R. 687, 703 (Bankr.S.D.N.Y. 1992). In *Drexel Burnham,* prepetition employment and escrow agreements created escrowed bond portfolios. *Id.* at 709. Under the terms of those agreements, the non-debtor party (Cohen) held both legal and equitable title to the portfolios, albeit with transfer restrictions. *Id.* at 710. The debtor's only interest was reversionary, if Cohen's employment was terminated for cause. *Id.* This interest passed into the estate when debtor filed bankruptcy. When it rejected the agreements, that rejection satisfied the conditions for Cohen to receive the bonds free and clear of restrictions. *Id.* at 711.

Similarly, Lakewood's bankruptcy estate took, at the time of filing, whatever interest in the subject trademark license that Lakewood held prepetition. Lakewood had conveyed to CAM a license to sell fans manufactured in advance, contingent on Lakewood's failure to purchase those fans within the 30 day period following the end of each month. Based on the testimony taken at trial, the intent of the parties is clear; they intended to create a license that would protect CAM's investment in the event Lakewood failed to purchase fans as anticipated. CAM's license would allow it to recoup its investment in fans already manufactured, as well as in

---

7. CAM also argues that the facts in *Deel* are distinguishable; this court is not inclined to engage in a review of the 1400+ docket entries in that case. The court acknowledges, however, that both the Asset Purchase Agreement and the Order Approving Sale of Property of the Estate in the instant case contained provisions expressly preserving CAM's claims. 09 B 5320, ECF Nos. 138 & 132 ¶ D.

parts it had in inventory or had committed to purchase. This license would "expire upon [CAM's] sale of all such remaining Forecasted Product not previously purchased by Lakewood in the time frame indicated above. The foregoing license shall survive any termination or expiration of this Agreement."

That license did not disappear with the bankruptcy filing, nor was it eliminated by rejection of the Supply Agreement. As of the Rejection Date, CAM knew that Lakewood would no longer be purchasing fans, and would have no further requirements— exactly the situation envisioned at the time the Supply Agreement was signed just three months earlier, and the reason for its negotiation and execution.

#### IV. *All Lakewood Box Fans Manufactured and Sold by CAM Were Covered by the License Granted in the Supply Agreement.*

Although the Supply Agreement contemplated production of approximately 1.2 million fans, CAM eventually manufactured only 511,220 box fans and sold to third parties a total of 445,989 box fans: 429,348 101 NS fans, and 16,641 Rain Guard fans.

CAM manufactured 136,357 [8] fans before the Supply Agreement was executed. 65,-720 fans were sold to Lakewood prior to the bankruptcy filing, and 14,440 fans were bartered to Lakewood on the date of the filing. This leaves 56,197 fans that were manufactured before the Supply Agreement was executed and eventually sold to third parties. The court determined in Section II(A) that the license contemplated by the Supply Agreement extended to these fans.

CAM had 159,917 fans in inventory on the date the involuntary petition was filed (taking for argument's sake, but not concluding, that to be the date on which Lakewood had no further actual requirements). Therefore, 429,348 - 159,917 = 269,431 fans were manufactured after Lakewood had no further requirements. However, the court determined in Section II(B) that the license contemplated by the Supply Agreement extended to fans built after Lakewood had no further actual requirements. Therefore, the manufacture and sale of these fans did not infringe Lakewood's patents or trademarks.

As described above in Section II(C), the Supply Agreement covered the manufacture and sale of the 16,641 Rain Guard fans.

Finally, CAM's remedy for breach was not limited to retention of Lakewood's equipment. As of the Rejection Date, CAM had on hand approximately 315,477 fans, and had an additional 133,693 motors on hand or on order. Under the license granted by the Supply Agreement as well as in the bill of sale in the barter transaction, CAM was entitled to use these motors to manufacture fans for sale to third parties. After the Rejection Date, CAM manufactured only 108,984 20" box fans. 315,477 fans on hand + 133,693 motors on hand = 449,170 box fans, which is more than the 429,348 101 NS fans that CAM sold to third parties.

The motors that CAM purchased after the Rejection Date—motors than Lakewood had ordered but for which it never paid the shipping company—are irrelevant to this analysis. First, CAM asked Szilagyi's permission prior to agreeing to purchase the motors. Since the Trustee's attorney indicated that CAM was free to pay

---

8. Plaintiff's Ex. 2 indicates that CAM produced 136,440 fans in September, October and November 2008, but the parties appear to agree on 136,357 as the appropriate number of pre-Supply Agreement fans.

the shipper and acquire these motors, it is difficult to blame CAM for doing so. More importantly, CAM *never used* these motors. They are still in CAM's inventory today.

CAM purchased 107,520 additional cord sets for use in 20″ box fans by purchase orders issued on March 25, 2009 (35,000 cord sets) and April 27, 2009 (72,520 cord sets). Payment for these cord sets was made in full on March 25, 2009, two days before the Trustee's motion to reject the Supply Agreement was filed.

CAM did purchase approximately 100,-000 pounds of plastic in order to manufacture these post-Rejection Date fans, but the court heard testimony that the motors and cord sets were the expensive parts of the fan. Barron indicated in her testimony that CAM could not have made fans under the license if it had only plastic on hand. Conversely, the license allowed CAM to make fans from motors on hand, even if it had to go out and purchase plastic to do so.

As the court concluded in Section II(D), the Supply Agreement did not limit CAM's remedy for leftover parts to retention of the Equipment. Instead, it created a license that sprang into existence when Lakewood failed to purchase the forecasted amount of Lakewood Box Fans. CAM had a license to use these leftover motors and cord sets to manufacture Lakewood Box Fans, and to sell those Lakewood Box Fans to third parties.

Consequently, all of the fans manufactured after the Rejection Date were manufactured under the license granted in the Supply Agreement, and the sale of all Lakewood-branded box fans by CAM to third parties was accomplished without violating patent or trademark laws.

Herman admitted selling 310 Lakewood Box Fans to Fred Meyer in October 2009, after a court order was entered specifically prohibiting such a sale. But this sale was a violation of a court order, and not of trademark or patent laws. At one time, it may have been appropriate to bring a motion seeking a rule to show cause why CAM should not be held in contempt for disobeying that court order. At this time, however, the court is satisfied with Herman's apology. No damages will be awarded for the sale to Fred Meyer.

### CONCLUSION

The Supply Agreement is an ambiguous document, and required consideration of extrinsic evidence before the court could determine that: (1) the license provided by the Supply Agreement extends to the fans that CAM manufactured before the contract was executed; (2) the license extends to fans built after Lakewood had no further actual requirements; (3) the license extends to manufacture of Rain Guard fans; and (4) CAM's remedy for breach was not limited to retention of Lakewood's equipment.

The court also concludes that the Supply Agreement anticipated that CAM would manufacture Lakewood Box Fans according to the forecast at Exhibit A, and that it granted CAM a license to sell those Lakewood Box Fans to third parties if Lakewood did not purchase them within a set period of time. This license was not terminated when the Supply Agreement was rejected; instead, this court uses its equitable powers to ensure that CAM is not stripped of its "fairly procured trademark rights."

Judgment is entered in favor of the Defendant, Chicago American Manufacturing, LLC, on all remaining counts of the Complaint.